**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRANDON R. VANDENBURG,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-989** |
| | ) | **Judge Trauger** |
| **SHAWN PHILLIPS, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## RESPONDENT'S ANSWER TO THE PETITION FOR A WRIT OF HABEAS CORPUS

---

### INTRODUCTION

Respondent opposes Petitioner Brandon Vandenburg's petition for a writ of habeas corpus filed under 28 U.S.C. § 2254.  Vandenburg raises eleven grounds for habeas corpus relief, claiming violations of his rights against double jeopardy, to present a defense, effective assistance of counsel, and against self-incrimination.

Vandenburg is entitled to no relief because he pleaded his claims in error-correction terms, which is inappropriate in this action.  Nevertheless, liberally construing his arguments, the properly exhausted claims provide no relief because he failed to show that the state appellate court's adjudications contradicted, or involved unreasonable applications of, clearly established federal law, or were based on unreasonable determinations of the facts established in state court. Vandenburg also procedurally defaulted several relief grounds, and, although he did not acknowledge these defaults, he would be unable to excuse them due to the overwhelming evidence of his guilt and lack of evidentiary support for these claims.  The Court should dismiss Vandenburg's petition with prejudice.

1

## PRELIMINARY CONSIDERATIONS

### I.     Successive Petition for Relief and Timeliness

This is Vandenburg's first habeas corpus petition challenging the judgments of conviction. (ECF 1, Page ID# 12); 28 U.S.C. § 2244(a). Vandenburg timely filed the petition. 28 U.S.C. § 2244(d).

### II.    Exhaustion of State Remedies

Vandenburg exhausted state remedies on all his grounds for relief. Specifically, he properly exhausted Grounds One through Four, Seven, and Nine through Eleven. R. 5(b), R. Gov'g § 2254 Cases; 28 U.S.C. § 2254(b). But he procedurally defaulted Grounds Five, Six, and Eight as explained below. *Id*.

### III.   Transcripts, Briefs, and Opinions

Respondent filed the "state court record relevant to this matter" as described in the Notice of Filing Documents. (ECF 16-17); R. 5(c)-(d), R. Gov'g § 2254 Cases. But, Respondent also has moved the Court (1) to waive the filing requirement concerning the irrelevant, voluminous, and, at times, sexually graphic trial exhibits and (2) for leave to file several documents under seal since they remain sealed in the state courts. (ECF 18-19.)

## STATEMENT OF THE CASE

Based upon evidence of a June 2013 sexual assault, the Davidson County Grand Jury indicted Vandenburg and three co-defendants on five counts of aggravated rape, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography. *State v. Vandenburg*, No. M2017-01882-CCA-R3-CD, 2019 WL 3720892, at *1 (Tenn. Crim. App. Aug. 8, 2019), *perm. app. denied* (Tenn. Jan. 15, 2020). The State jointly tried Vandenburg and co-defendant Corey Batey in January 2015. *Id*. The jury convicted Vandenburg

of four counts of aggravated rape, one count of attempted aggravated rape, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography. *Id*.

However, the trial court granted Vandenburg's motion for a mistrial[1] "because the jury foreperson failed to disclose that he had been named a victim of statutory rape in a prior criminal case[,]" leading to a "presumption of bias[.]" *Id*. The State then obtained a superseding indictment charging Vandenburg with five counts of aggravated rape, two counts of aggravated sexual battery, and one count of unlawful photography. *Id*. Vandenburg proceeded to trial in June 2016. *Id*. The jury convicted him as charged. *Id*.

Vandenburg appealed his judgments of conviction to the Tennessee Court of Criminal Appeals ("TCCA") and raised many of the issues he now raises on habeas review. *See generally id*. The TCCA partly affirmed the judgments but modified one of Vandenburg's aggravated rape convictions to attempted aggravated rape and remanded the case for resentencing on that count. *Id*. The Tennessee Supreme Court denied Vandenburg's application for permission to appeal. *See generally id*.

Vandenburg then timely petitioned for post-conviction relief in the trial court. *Vandenburg v. State*, No. M2022-01548-CCA-R3-PC, 2024 WL 330525, at *3 (Tenn. Crim. App. Jan. 30, 2024), *perm. app. denied* (Tenn. June 20, 2024). The trial court held an evidentiary hearing and denied post-conviction relief in a written order. *Id*. at *3-7. Vandenburg appealed this relief denial to the TCCA, which affirmed the trial court's judgment. *Id*. at *1. The Tennessee Supreme Court denied Vandenburg's application for permission to appeal. (ECF 17-8.)

---

[1] The TCCA later construed this pleading and the trial court's decision on it as a granted motion for a new trial. *Vandenburg*, 2019 WL 3720892, at *24.

Vandenburg timely filed the instant habeas corpus petition by placing it in the prison mailing system on August 12, 2024. (ECF 1, Page ID# 17.) The Court directed Respondent to file the state-court record and a response to the petition in January 2025. (ECF 9, Page ID# 157-59.) Thus, this response is properly before the Court.

## STATEMENT OF THE FACTS

Respondent incorporates the factual summaries as written by the TCCA in its direct and post-conviction appellate opinions. *See Vandenburg*, 2024 WL 330525, at *3-8; *Vandenburg*, 2019 WL 3720892, at *1-20.

## STANDARD OF REVIEW

Habeas corpus relief shall not be granted on any federal claim "that was adjudicated on the merits" in state court unless the decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts" based on evidence presented in state court. 28 U.S.C. § 2254(d)(1)-(2). "Clearly established federal law" means the Supreme Court's holdings, not its dicta, at the time of the state-court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This "highly deferential" standard prevents "federal habeas retrials," ensuring state "convictions are given effect to the extent possible under law." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotations and citations omitted); *Carter v. Bogan*, 900 F.3d 754, 767 (6th Cir. 2018) (internal quotations omitted).

A claim is "adjudicated on the merits" in state court when the state court issued a "decision, which resulted from an adjudication." *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (internal quotations omitted). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

4

absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. The state court need not cite clearly established federal law and need not "reveal[] which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a claim, not a component of one, has been adjudicated." *Id*. at 98 (internal quotations omitted). When examining an adjudicated claim, the federal court must decide the claim based on the record the state court used to decide the claim. *Black v. Carpenter*, 866 F.3d 734, 741 (6th Cir. 2017) (citing *Pinholster*, 563 U.S. at 181).

A state-court decision is contrary to clearly established federal law if the state court reached an opposite conclusion on a question of law that the Supreme Court previously decided or if the state court confronted materially indistinguishable facts from a relevant Supreme Court precedent and reached an opposite conclusion. *Williams*, 529 U.S. at 405. Thus, the adjudication must be "diametrically different" or "mutually opposed" to the relevant Supreme Court precedent. *Id*. However, "a run-of-the-mill state-court decision applying the correct legal rule … to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id*. at 406.

Under the unreasonable application clause, a federal habeas court must ask whether the state court's application of the clearly established federal law was objectively unreasonable. *Id*. at 409. "To satisfy this high bar, a petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015). Therefore, a court cannot issue the writ based on its conclusion that a state court incorrectly applied the clearly established federal law. *Williams*, 529 U.S. at 411.

5

And a petitioner is not entitled to relief under 28 U.S.C. § 2254(d)(2) without a showing that the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state-court factual determination "is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (internal quotation marks and citation omitted). As the Sixth Circuit has noted, "it is not enough that reasonable minds reviewing the record might disagree with the state court's factual determination; rather, the record must 'compel the conclusion that the [state] court had no permissible alternative' but to arrive at the contrary conclusion." *Carter*, 900 F.3d at 768 (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)). "[T]he question for this court to answer 'is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Hill v. Shoop*, 11 F.4th 373, 384 (6th Cir. 2021) (en banc) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Additionally, a federal habeas court generally must presume the correctness of state-court factual findings, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness extends to factual findings made by a state appellate court based upon that court's review of trial court records. *Johnson v. Genovese*, 924 F.3d 929, 938 (6th Cir. 2019) (citing *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012)). Unless the petitioner can prove facts to overcome the presumption, the federal court must presume the state-court determination of the facts to be true. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004).

A court must defer to the state court's credibility findings because it "is not as well positioned as the trial court is to make credibility determinations." *Miller-El v. Cockrell*, 537 U.S.

322, 339 (2003).  While credibility determinations constitute judgment calls, a court cannot disturb these determinations unless the presented evidence is "too powerful to conclude anything" else but an erroneous determination.  *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).

This demanding review of claims denied in state court is applied for claims that were properly exhausted in state court.  § 2254(b)(1)(A).  In Tennessee, a petitioner exhausts state remedies on a claim when the claim is presented to at least the TCCA.  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39).  "To be properly exhausted, each claim must have been fairly presented to the state courts."  *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009).  "Fair presentation" requires the petitioner to provide state courts with the "opportunity to see both the factual and legal basis for each claim."  *Id*. at 414-15.  While a petitioner need not cite "chapter and verse" of federal constitutional law to fairly raise a claim, the petitioner must "make a specific showing of the alleged claim."  *Id*. at 415 (citing *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

If a petitioner fails to properly exhaust a claim in state court when state-court remedies are authorized and state law bars exhaustion at a later time, the petitioner has technically exhausted the claim.  But it is regarded as procedurally defaulted because "there are no state remedies any longer available to him."  *See* § 2254(c); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (internal quotations omitted).  In cases of procedural default, federal habeas corpus review is barred unless the petitioner can demonstrate cause for the default and actual prejudice or demonstrate that the failure to consider the claim will result in a fundamental miscarriage of justice—meaning that he is actually innocent.  *Coleman*, 501 U.S. at 750.  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the

defense impeded counsel's efforts to comply with the State's procedural rule." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).

## ARGUMENT

**I.** **Ground One's Double-Jeopardy Claim Provides Vandenburg No Relief Because He Fails to Show How the State-Court Adjudication Runs Afoul of AEDPA.**

Vandenburg first alleges that the trial court violated his right against double jeopardy by denying his motion to dismiss the superseding indictment. (ECF 1-1, Page ID# 18-20.) Vandenburg claims that "jeopardy attaches when the jury is impaneled and sworn," and that the juror bias that the trial court determined occurred in the first trial "did not terminate the original jeopardy." (ECF 1-1, Page ID# 19.) Thus, he contends the trial court should have dismissed the superseding indictment. (ECF 1-1, Page ID# 18-20.) But as explained below, no double jeopardy violation occurred, meaning the TCCA neither contradicted, nor unreasonably applied, clearly established federal law, nor based its decision on an unreasonable determination of the facts established in state court.

The TCCA affirmed the trial court's denial of the double jeopardy argument on direct appeal as follows:

> Defendant argues that the trial court violated "his rights to due process and protection against double jeopardy under the Tennessee Constitution, Art. 1, § 10, and the Fifth Amendment of the United States Constitution" by denying his motion to dismiss the superseding indictment. He asserts that the trial court should have dismissed the superseding indictment because jeopardy attached to the original indictment when the trial court swore in the jury at Defendant's first trial. Defendant argues that the original indictment failed to charge aggravated rape and aggravated sexual battery and contends that the State was "prohibited from adding offenses to the superseding indictment when it failed to include them in the original indictment." Additionally, he asserts that none of the exceptions to the mandatory joinder rule apply in this case, so the State should have joined the charges of aggravated rape and aggravated sexual battery to the charges of assault in the original indictment. Further, he argues that the State engaged in prosecutorial vindictiveness by seeking a superseding indictment. In his reply brief, Defendant argues that he should have been retried on the original indictment because jeopardy

8

attached to the original indictment at the first trial, and therefore, the State was prohibited by Tennessee Rule of Criminal Procedure 7(b) from amending the indictment without Defendant's consent.

The State responds that Defendant's second trial did not violate double jeopardy principles because double jeopardy does not preclude the retrial of Defendant. The State argues that the jeopardy from Defendant's first trial did not terminate when the trial court granted Defendant's motion for a new trial; essentially, the jeopardy from the first trial "continued" to the superseding indictment. Additionally, the State contends that the issuance of the superseding indictment did not violate double jeopardy principles because "the superseding indictment was issued well before the second trial, giving ... [D]efendant ample notice of the charges." Further, the State asserts that Defendant received adequate notice of the charges in the superseding indictment because it charged the same offenses as the initial indictment except for the omission of the destruction of evidence charge. The State argues that it properly exercised its discretion by obtaining a superseding indictment that clarified "that the aggravated rape and aggravated sexual battery charges were based on the incapacity of the victim."

On August 9, 2013, the Davidson County Grand Jury returned an eight-count indictment against Defendant and Co-defendants Banks, Batey, and McKenzie. Counts one through five alleged aggravated rape and used the following language:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:
>
> BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE between the 22nd day of June, 2013, and the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally, knowingly, or recklessly engage in unlawful sexual penetration of [E.L.] and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie were aided or abetted by one or more other persons, in violation of Tennessee Code Annotated § 39-13-502, and against the peace and dignity of the State of Tennessee.

Counts six and seven alleged aggravated sexual battery using the following language:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:
>
> BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE between the 22nd day of June, 2013, and the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally engage in unlawful sexual

contact with [E.L.], and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie were aided or abetted by one or more other persons, in violation of Tennessee Code Annotated § 39-13-504, and against the peace and dignity of the State of Tennessee.

The record on appeal includes a document entitled Defendant's "Memorandum of Law Regarding Counts 1 Through 7 of Indictment[.]" In this memorandum, Defendant argued that "[c]areful examination of Counts 1 through 7 of the instant indictment shows that the only criminal offense as to which every element is alleged is assault in violation of Tennessee Code Annotated § 39-13-101(a)(3)[.]" Thus, Defendant asserted that the language of counts one through five in the indictment failed to allege "force, coercion, a weapon or any other article." Defendant also noted that the indictment of counts one through five failed to allege bodily injury or that "any defendant knew or had reason to know that the victim was mentally defective, mentally incapacitated or physically helpless." Defendant alleged that the indictment for counts six and seven similarly failed to allege aggravated sexual battery under Tennessee Code Annotated section 39-13-504(a)(3). In its response, the State argued that "[a]n indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements of [*State v. Hill*, 954 S.W.2d 725 (Tenn. 1997)], giving the accused sufficient notice of the charged offense."

During a jury-out hearing in Defendant's first trial, Defendant alleged that "the facts found by the Grand Jury only make out a misdemeanor offense of assault." Defendant asked the trial court to instruct the jury only on assault. The trial court noted that the State charged alternative theories in the aggravated rape and aggravated sexual battery counts and elected to proceed on the allegation that E.L. was mentally incapacitated during the offenses. The trial court found that the Davidson County Grand Jury indicted Defendant and Co-defendants Banks, Batey, and McKenzie with aggravated rape and aggravated sexual battery. The trial court concluded that "the parties ha[d] been given sufficient notice[.]" The jury found Defendant guilty of four counts of aggravated rape, one count of attempted aggravated rape, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography..

On June 15, 2015, 139 days after the jury found him guilty, Defendant filed a motion for mistrial or, in the alternative, a motion to set aside the verdict on the basis that the jury foreperson made a material misrepresentation during voir dire. At the motion hearing on the same day,11 the jury foreperson gave testimony that "was inconsistent with the answers provided during voir dire." On June 23, 2015, the trial court granted Defendant's motion; the trial court's order notes that Defendant "did not request a new trial pursuant to Rule 33 out of concern that [he] may waive any appellate issues." The trial court stated that, "as a practical matter, a new trial, if granted, would have to be pursuant to Rule 33 of the Tennessee Rules of Criminal Procedure." The trial court stated that "[a] mistrial is granted prior to the verdict in a trial" and that a defendant could challenge juror misconduct in a

motion for new trial. The trial court cited to *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993), for the conclusion that "[w]hen conduct becomes apparent after the jury has rendered a verdict, a new trial is the appropriate remedy." The trial court concluded that the jury foreperson committed misconduct when he failed to disclose during voir dire that he was the named victim in a twenty-three count indictment in a statutory rape case and granted Defendant's motion.

On July 7, 2015, the Davidson County Grand Jury returned a superseding indictment charging Defendant and Co-defendants Banks, Batey, and McKenzie with five counts of aggravated rape, two counts of aggravated sexual battery, and one count of unlawful photography. The aggravated rape counts alleged the following:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

> BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE on the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally, knowingly, or recklessly engage in unlawful sexual penetration of [E.L.] and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie did aid or abet each other in the commission of the offense and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie knew or had reason to know that [E.L.] was mentally incapacitated or physically helpless, in violation of Tennessee Code Annotated § 39-13-502, and against the peace and dignity of the State of Tennessee.

The aggravated sexual battery counts alleged the following:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

> BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE on the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally engage in unlawful sexual contact with [E.L.], and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie did aid or abet each other in the commission of the offense and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie knew or had reason to know that [E.L.] was mentally incapacitated or physically helpless, in violation of Tennessee Code Annotated § 39-13-504, and against the peace and dignity of the State of Tennessee.

On September 11, 2015, Defendant filed a "Motion to Dismiss Superseding Indictment," which argued that "[t]he superseding indictment allege[d] an additional element in Counts 1-7 that was not alleged in the original indictment, specifically that the defendants 'knew or had reason to know that [the alleged victim] was mentally incapacitated or physically helpless' in the counts alleging aggravated rape and aggravated sexual battery." Defendant contended that the inclusion of additional or different elements violated his protection against double jeopardy. He also asserted that the jeopardy that attached to the original indictment continued due to the mistrial, and therefore, the State should proceed under the original indictment.

The State responded that it could properly proceed on the superseding indictment because the trial court's grant of a new trial "returned ... Defendant to the same position he was in prior to the first trial[.]" At a hearing on the motion on October 19, 2015, the trial court found that "there [were] no new charges that [were] brought with the superseding indictment, only an additional element." The trial court stated that the grant of a new trial "place[d] the defendants back in the same position that they were initially and, as such, ... a superseding indictment can be brought[.]" On October 20, 2015, the trial court filed an order denying Defendant's motion to dismiss the superseding indictment. The trial court found "that the indictment [wa]s appropriate and the charges therein should not be dismissed."

On June 13, 2016, the first day of Defendant's second trial, Defendant again filed a motion to dismiss the superseding indictment and argued that the indictment violated the prohibition against double jeopardy. The court minutes from that day reflect that the trial court denied this motion. The trial court entered a written order denying the motion on June 22, 2016, and again concluded that "[t]he superseding indictment which was filed after the mistrial was not amended with additional charges nor does it require joinder."

After the trial court swore in the jury, the State read the indictments, and Defendant pled not guilty, Defendant filed a motion to dismiss the indictments. Defendant argued that because jeopardy attached during the first trial and continued to the second trial, he was placed in jeopardy twice for the same offenses once the jury was sworn in the second trial. Defendant asserted that jeopardy continued from the first trial because the trial court declared a mistrial. Defendant also argued that the State should have proceeded on the original indictment because the State cannot obtain a superseding indictment while jeopardy continues from a previous indictment. The State argued that it had properly obtained a superseding indictment. The trial court denied the motion, and the trial proceeded.

Initially, we must determine whether the trial court granted a motion for mistrial or a motion for new trial after the conclusion of Defendant's first trial. Although Defendant apparently filed a motion for mistrial, the trial court concluded that a new trial was the appropriate remedy to address the juror misconduct that came to light after the jury rendered its verdict and Defendant's first trial concluded. "A

mistrial is granted in a case in which the jury is discharged without a verdict; a motion for new trial is made after a judgment has been rendered." *State v. Terry Sanders*, No. M2011-00426-CCA-R3-CD, 2012 WL 5948885, at \*4 (Tenn. Crim. App. Nov. 15, 2012) (quoting *Howell v. Davis*, 299 S.E.2d 336, 337 (S.C. 1983)) (internal quotation marks omitted), *perm. app. denied* (Tenn. Mar. 5, 2013). Because Defendant filed his motion after the jury rendered its verdict and because the trial court essentially treated the motion as a motion for new trial, we will interpret Defendant's motion as a motion for new trial.

### (A) Double jeopardy

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No person shall ... be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

A defendant acquitted of criminal charges may not be subjected to retrial on those same charges. *State v. Harris*, 919 S.W.2d 323, 327 (Tenn. 1996); *see also Ball v. United States*, 163 U.S. 662, 671 (1896). Additionally, "when a conviction has been set aside because of insufficiency of the evidence, double jeopardy forbids giving the prosecution 'another opportunity to supply evidence which it failed to muster in the first proceeding.'" *Harris*, 919 S.W.2d at 327 (quoting *Burks v. United States*, 437 U.S. 1, 11 (1978)). However, a retrial of a defendant who has successfully appealed an issue other than sufficiency of the evidence does not subject the defendant to double jeopardy. *Id.* (citing *Burks*, 437 U.S. at 11; *Ball*, 163 U.S. at 672; *State v. Campbell*, 641 S.W.2d 890, 893 (Tenn. 1982)); *see also Lockhart v. Nelson*, 488 U.S. 33, 38 (1988) *Jeffers v. United States*, 432 U.S. 137, 152 (1977); *Price v. Georgia*, 398 U.S. 323, 326 (1970); *Green v. United States*, 355 U.S. 184, 189, 192 (1957). Further, "upon appellate reversal of a conviction[,] the Government is not limited at a new trial to evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence." *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 243 (1957). This is more commonly known as the "clean slate" rule. *See State v. Kacy Dewayne Cannon*, No. E2011-02624-CCA-R3-CD, 2012 WL 6049639, at \*8 (Tenn. Crim. App. Dec. 5, 2012), *perm. app. denied* (Tenn. Apr. 10, 2013). Thus, the mere fact that Defendant's case was retried after the trial court granted a new trial on the basis of juror misconduct did not place Defendant under jeopardy twice for the same criminal conduct.

13

The Tennessee Supreme Court stated the following regarding the State's power to seek superseding indictments:

> The power to seek a superseding indictment lies within th[e] broad discretion of the State. A superseding indictment is an indictment obtained without the dismissal of a prior indictment. Where there has been no jeopardy on the first indictment, a grand jury may return a new indictment against an accused even though another indictment is pending. Although the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority. Thus, the State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial.

*State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000) (internal citations and footnote omitted).

When the trial court granted Defendant's motion, the judgments from the first trial were vacated, and Defendant returned to the pretrial stage of the criminal proceeding, with the exception of the jury's acquittal of aggravated rape in count four. Essentially, it was as if Defendant's first trial never happened. Thus, because Defendant's case had not proceeded to trial, the State had the discretion to seek a superseding indictment. *See id*.

In any event, excluding count four, which we will discuss in depth later in this opinion, the original and superseding indictments charged the same offenses. The Tennessee Supreme Court has previously held that "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000); *see also State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999), *Ruff v. State*, 978 S.W.2d 95, 100 (Tenn. 1998). Here, the original indictment did not list the aggravating factor of the aggravated rape and aggravated sexual battery counts, but the indictment did refer to the appropriate section of Tennessee Code Annotated for those offenses. Thus, the original indictment was still sufficient to put Defendant on notice of the offenses for which he was charged. Additionally, because the original and the superseding indictment both charged Defendant with committing aggravated rape and aggravated sexual battery, the State did not improperly amend the offenses by obtaining a superseding indictment.

Because the State had the discretion to seek a superseding indictment after the trial court ordered a new trial and because the original and superseding indictment both charged Defendant with aggravated rape and aggravated sexual battery, the State did not place Defendant in jeopardy twice for the same offense by seeking the superseding indictment.

14

*Vandenburg*, 2019 WL 3720892, at *21-25 (footnotes omitted).

As shown above, the TCCA correctly cited and described the three double-jeopardy protections bestowed by the Fifth Amendment to the United States Constitution when adjudicating the claim. *Vandenburg*, 2019 WL 3720892, at *24-25. One is protected from (1) "a second prosecution for the same offense after acquittal;" (2) "a second prosecution for the same offense after conviction;" and (3) "multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (additional citations omitted)). The TCCA cited additional clearly established federal law governing the situation where a successful appeal of "an issue other than sufficiency of the evidence does not subject the defendant to double jeopardy." *Vandenburg*, 2019 WL 3720892, at *24 (citing *State v. Harris*, 919 S.W.2d 323, 327 (Tenn. 1996) (citing *Burks v. United States*, 437 U.S. 1, 11 (1978)). Finally, the TCCA quoted more Supreme Court precedent for the proposition that, "upon appellate reversal of a conviction[,] the Government is not limited at a new trial to evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence." *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 243 (1957).

Preliminarily, the Court should deny the claim because, although Vandenburg correctly identifies the AEDPA standards of review, he does not argue his claim in terms of AEDPA. His claim is one requesting error correction, exemplified by his choice of language beginning with the heading and continuing throughout his argument. (ECF 1-1, Page ID# 18-20.) The Court cannot grant habeas corpus relief where a petitioner seeks "mere ordinary error correction[.]" *Hale v. Cool*, 122 F.4th 637, 645 (6th Cir. 2024). Because Vandenburg failed to argue the claim in terms of § 2254(d), the Court may dismiss it without analysis. *Compare Hank v. Beltz*, No. 13-cv-1472,

2014 WL 4626456, at *3 (D. Minn. Sept. 15, 2014), *certificate of appealability denied* No. 14-3268 (8th Cir. Jan. 30, 2015).

However, the Court must construe Vandenburg's *pro se* habeas corpus petition liberally. *Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985). But, even with liberal construction, he has shown no entitlement to relief.

First, the contrary-to clause provides no relief because the TCCA correctly cited and supported its decision with the correct clearly established federal law governing the double jeopardy issue. *See Vandenburg*, 2019 WL 3720892, at *24-25. And when the TCCA cited Tennessee law, those cases clearly incorporated the governing federal precedents, meaning the state-law citations are not "diametrically different" from their federal counterparts. *Williams*, 529 U.S. at 405. A state court's analysis of a federal constitutional claim "does not require citation" or even "*awareness*" of Supreme Court precedent "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (emphasis in original). Based upon this law and the TCCA's plain language, Vandenburg cannot show that the state-court adjudication contradicted clearly established double jeopardy law.

Second, the TCCA's decision did not involve an unreasonable application of this clearly established federal law. § 2254(d)(1). Importantly, the TCCA observed that, "[i]n *Burks* the [Supreme] Court stated that when an appellate court reverses for errors in the proceedings leading to the conviction, the Double Jeopardy Clause does not preclude a retrial." *Delk v. Atkinson*, 665 F.2d 90, 92 (6th Cir. 1981) (citing *Burks*, 437 U.S. at 14-15; *United States v. Tateo*, 377 U.S. 463, 465 (1964)).

That is essentially what happened here when the trial court granted Vandenburg a new trial based on a claim of juror bias that occurred during his first trial. *Vandenburg*, 2019 WL 3720892,

16

at *22. "The Sixth Amendment … guarantees a criminal defendant a trial by an impartial jury." *Williams v. Bagley*, 380 F.3d 932, 943 (6th Cir. 2004) (citing *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992)). "[E]ven a single biased juror deprives a defendant of his right to an impartial jury." *Id.* at 944 (citing *Morgan*, 504 U.S. at 729). Therefore, juror bias certainly constitutes an "error[]" in the proceedings leading to the conviction[.]" *Delk*, 665 F.2d at 92. Here, the trial court determined that the fact that the foreperson "failed to disclose during voir dire that he was the named victim in a twenty-three count indictment in a statutory rape case" constituted juror bias. *Vandenburg*, 2019 WL 3720892, at *22. Thus, a new trial was warranted.

With this background, the TCCA did not unreasonably apply clearly established double jeopardy law. Because of the juror bias in the first trial leading to the convictions, the trial court's grant of a new trial "vacated" those judgments, meaning "it was as if [Vandenburg's] first trial never happened." *Vandenburg*, 2019 WL 3720892, at *25. The case effectively returned to pretrial status. Thus, the prosecution operated well within the law in obtaining a superseding indictment charging Vandenburg with the same offenses of which he was initially convicted.[2] *Vandenburg*, 2019 WL 3720892, at *25. In short, the TCCA's adjudication constituted not only a reasonable application of federal double jeopardy precedents, but also a correct application. *See Donald*, 575 U.S. at 316.

Vandenburg's argument easily fails. He claims the TCCA "deliberately" ignored clearly established federal law by not acknowledging that "jeopardy attaches when the jury is impaneled and sworn" and continues "until there is" a terminating event. (ECF 1-1, Page ID# 19.) He argues

---

[2] The prosecution did not seek re-indictment of Count Four since the jury acquitted Vandenburg during the first trial. *Vandenburg*, 2019 WL 3720892, at *25. In so doing, the prosecution avoided a double jeopardy violation. *Pearce*, 395 U.S. at 717 (double jeopardy right bars "a second prosecution for the same offense after acquittal").

17

the juror issue that led to his new-trial motion being granted did "not terminate the original jeopardy." (ECF 1-1, Page ID# 19.)

Of course, this argument is not based in AEDPA terms, so Vandenburg necessarily did not show an unreasonable application of double jeopardy law. Nevertheless, these assertions "fall[] far from the mark." (ECF 1-1, Page ID# 18.) Although Vandenburg correctly observed that "[j]eopardy attaches when the original panel is seated and sworn[,]" *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996), he "side steps" *Burks* and *Tateo*, precedents that clearly establish the proposition that the "Double Jeopardy Clause does not preclude a retrial" on the charges when an "error in the proceedings leading to the conviction" is discovered and remedied by granting a new trial. *Delk*, 665 F.2d at 92 (citing *Burks*, 437 U.S. at 14-15; *Tateo*, 377 U.S. at 465). "[T]he tardy bell had [not] already rung" on jeopardy as Vandenburg claims. (ECF 1-1, Page ID# 19.) Thus, he certainly has shown no unreasonable application of federal law since he overlooks these key precedents.

Third and finally, Vandenburg cursorily claims that the state appellate court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." (ECF 1-1, Page ID# 18-20.) Yet, he identifies no fact underlying the decision that he believes was unreasonably determined. Notably, Vandenburg agrees with the facts underlying the TCCA's decision, specifically that he was convicted at his first trial; that the trial court granted him a new trial because of juror bias; that the prosecution obtained a superseding indictment; and that he was convicted at his second trial. (ECF 1-1, Page ID# 18-20.) He merely disagrees with the legal conclusions supported by these facts. Put simply, he has neither attempted to show that the state court unreasonably determined the underlying facts nor attempted to rebut

18

the presumption of correctness afforded these findings by clear and convincing evidence.  §§ 2254(d)(2), (e)(1).

Vandenburg is not entitled to habeas corpus relief on his double jeopardy claim.  The Court should dismiss Ground One with prejudice.

## II.    The Properly Exhausted Claims Alleging Violations of Vandenburg's Right to Present a Defense in Grounds Two, Four, and Seven Provide No Relief Because He Has Not, and Cannot, Satisfy the Highly-Deferential AEDPA Standard of Review, while the Defense-Right Claim Alleged in Ground Eight is Procedurally Defaulted.

Vandenburg contends in Grounds Two, Four, Seven, and Eight that the trial court violated his Sixth Amendment right to present a defense, and that the TCCA's adjudications run afoul of AEDPA.  (ECF 1-1, Page ID# 20-26, 32-35, 41-43.)

The Sixth Amendment provides a defendant "a meaningful opportunity to present a complete defense."  *Chandler v. Brown*, 126 F.4th 1178, 1189 (6th Cir. 2025) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)), *vacated en banc*, (6th Cir. May 9, 2025).  This "meaningful opportunity" is bestowed upon defendants through that amendment's trial rights and the Fourteenth Amendment's Due Process Clause.  *Id.* (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  The right to present a defense includes the right for a defendant to present his own "version of the facts" and the "right to present [his] own witnesses to establish a defense."  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  A defendant also has the right to present evidence "critical to [the] defense[.]"  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

But the defense right "is not absolute" and sometimes "must yield to other legitimate interests in the criminal trial process."  *Id.* at 295.  When exercising this right, the defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence[,]" although these rules cannot "be applied mechanistically to defeat the ends of justice."  *Id.* at 302.  So long as the rules are not "arbitrary"

or "disproportionate to the purposes they are designed to serve[,]" they do not preclude the defendant's right to present a defense. *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). When determining whether an evidentiary exclusion violates a defendant's right to present a defense, reviewing courts consider whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *Chambers*, 410 U.S. at 298-301.

As explained below, Vandenburg has shown no entitlement to a writ of habeas corpus based upon any of his defense-right allegations contained in these four relief grounds.

### A. Because the TCCA Appropriately Cited and Applied *Chambers*, Vandenburg Cannot Show that the State-Court Adjudication of Ground Two Contradicted, or Unreasonably Applied, Clearly Established Federal Law, or that it was Based on an Unreasonable Determination of the Established Facts.

Vandenburg claims the trial court violated his right to present a defense by excluding Dr. Alexander's proposed expert testimony concerning Vandenburg's ability to form criminal intent due to his intoxication. (ECF 1-1, Page ID# 20-26.) Following trial, Vandenburg properly presented this Sixth Amendment claim to the TCCA during his direct appeal, and he now claims this state-court decision, reproduced below, entitles him to habeas corpus relief.

The TCCA affirmed the trial court's exclusion of Dr. Alexander's proposed expert testimony as follows:

> Defendant contends that the trial court erred in excluding the testimony of a defense witness, Dr. Sidney Alexander. He asserts that a major part of his trial strategy was arguing that "he was so intoxicated from alcohol at the time of the alleged offenses that he did not have the capacity to form the intent necessary to be criminally responsible for the offenses committed by his co-defendants." Defendant argues that the trial court's decision prejudiced him and violated his right to due process and a fair trial. The State responds that "the trial court acted within its discretion in excluding the testimony based on the defendant's untimely notice and the expert's lack of qualifications."

20

On September 15, 2014, prior to his first trial, Defendant filed a notice of intent to offer expert testimony on his mental state. The notice stated that Defendant intended to call Dr. Stephanie Stolinsky at trial. The record reveals that the State received Dr. Stolinsky's report on October 13, 2014. On October 17, 2014, the State filed a motion to exclude Dr. Stolinsky's testimony on the ground that her testimony would not be admissible under Tennessee Rules of Evidence 401 and 702. Dr. Stolinsky's report was not included in the record on appeal as an exhibit, but it was attached to the State's motion. Dr. Stolinsky did not testify at Defendant's first trial.

On September 25, 2015, Defendant filed a "Motion for Leave of Court to Tender Motion on Experts[.]" The Motion stated that, on September 11, 2015, the trial court held a scheduling conference and set a date for filing of notice of experts. Defendant asked for an extension of thirty days to file a notice of expert testimony. Defendant attached an email to this motion from the Criminal Court Clerk to all prosecutors and defense attorneys involved in the case. The email referred to a meeting in the trial judge's chambers that was held that morning and stated that September 25, 2015, was the deadline for filing motions on experts. The trial court granted this motion on September 25, 2015, according to a minute entry from that date. On October 12, 2015, Defendant filed a "Motion for Leave of Court to File Pretrial Motions[.]" This motion stated that Defendant had "identified and retained particular experts" and asked the trial court to extend its original deadline for the filing of pretrial motions on October 9, 2015. At a motion hearing on October 19, 2015, the trial court set a deadline of December 1, 2015, for Defendant to file a notice of expert testimony.

On May 6, 2016, the State filed a motion to exclude Defendant's experts, Jim Kempvanee and Dr. Alexander. The State noted that, at the October 19, 2015 motion hearing, the trial court set December 1, 2015, as the deadline for Defendant to file a notice of expert witnesses. The State's motion also alleged that Defendant had failed to provide any reports from his experts. On May 10, 2016, Defendant filed a reply to the State's motion, in which he asserted that, on October 9, 2015, he filed a motion to renew all motions previously filed in the first trial, which included motions "related to the use of expert testimony[.]" The reply also noted that Defendant gave the State notice on April 28, 2016, that he intended to call Dr. Alexander at trial to testify regarding Defendant's mental condition and Mr. Kempvanee to testify on "digital forensic analysis and technology." Defendant argued that the State would not suffer any prejudice by the testimony of these two experts at trial because the State had been aware since the first trial that Defendant might introduce expert testimony. Defendant also argued that Dr. Alexander and Mr. Kempvanee were defense rebuttal witnesses and, therefore, not subject to disclosure under Tennessee Rule of Criminal Procedure 16(b)(1)(B)(i)-(iii).

The trial court granted the State's motion to exclude the testimony of Dr. Alexander and denied the State's motion to exclude the testimony of Mr. Kempvanee on May 18, 2016. The order stated that the trial court "specifically set a deadline for the defense to give notice of an expert and provide a report of that expert's findings and

that was not done." On May 31, 2016, Defendant filed a motion asking the trial court to reconsider its grant of the State's motion to exclude the testimony of Dr. Alexander. The motion to reconsider reiterated many of Defendant's previous arguments regarding the admission of Dr. Alexander's testimony. Notably, Defendant attached Dr. Alexander's report, dated May 27, 2016, to the motion to reconsider.

On May 31, 2016, Defendant filed an "Application for Rule 10 Extraordinary Appeal and Stay of the Trial Proceedings" with this court.13 Defendant asserted in the application that "[t]he actions of the trial court in precluding the defense from presenting evidence regarding [Defendant]'s mental condition bearing on the issue of guilt has so far departed from the accepted and usual course of judicial proceedings as to require immediate review[.]" Defendant argued that the trial court's decision to exclude Dr. Alexander's testimony violated his right to present a defense and was an abuse of discretion because the State would not be actually prejudiced if Dr. Alexander testified.

On June 1, 2016, this court denied Defendant's Rule 10 appeal. This court concluded that Defendant did "not satisf[y] the 'narrowly circumscribed' requirements for an extraordinary appeal." This court determined that "[t]he trial court's order reflects that the trial court followed the accepted and usual course of judicial proceedings prior to ruling on the four motions at issue."

On June 7, 2016, the trial court ruled that it would hold a jury-out hearing to determine whether the testimony of Dr. Alexander was admissible. The court minutes from June 13, 2016, reflect that the trial court denied Defendant's motion to reconsider. In a written order filed on June 14, the trial court set out its reasoning for denying Defendant's motion after the hearing. The trial court found that,

> 1) although each party has had ample time to conduct an evaluation of [D]efendant ... , neither party has secured an evaluation of the defendant; (2) although Dr. J. Sid Alexander testified regarding his psychiatric expertise, Dr. Alexander did not demonstrate any specialized expert opinion knowledge or training regarding toxicology; and (3) Dr. Alexander relied on information supplied via email by defense counsel and did not base any opinion on data, documentation or scientific evidence. Further, the Court finds that the underlying facts indicate a lack of trustworthiness of Dr. Alexander's testimony.

On June 10, 2016, prior to the commencement of the second day of voir dire, the trial court held a hearing on Defendant's motion to allow Dr. Alexander to testify regarding Defendant's mental state and intoxication during the offenses. The trial court heard arguments from both Defendant and the State and asked to hear from Dr. Alexander on the first day of trial. On June 13, 2016, the trial court held a jury-out hearing on the admissibility of Dr. Alexander's testimony. The State and Defendant stipulated that Dr. Alexander was a board-certified psychiatrist. Dr.

22

Alexander testified that, to prepare the letter that Defendant submitted to the trial court, he examined data given to him by defense counsel. This data was Defendant's "best recollection" of the alcohol that he consumed prior to the offenses. Dr. Alexander explained that he was retained by Defendant to calculate Defendant's blood alcohol content ("BAC") during the offenses. He looked at "many different tables" and "many different sources of information" but focused on a formula for calculating BAC based on "Widmark's principle[.]" Dr. Alexander noted that the number of drinks that he used to calculate Defendant's BAC was "the most conservative number" because Defendant stated that he consumed more alcoholic drinks than he could specifically remember. Dr. Alexander also calculated how Defendant's body metabolized alcohol by multiplying the fourteen hours during which Defendant consumed alcohol with 0.015; this number represented "the blood alcohol that was metabolized and no longer present." Finally, Dr. Alexander subtracted the first blood alcohol figure from the second to arrive at "what the blood alcohol level most likely was at 2 a.m." Dr. Alexander testified that the most reliable estimate of Defendant's BAC during the offenses was 0.22. He estimated that Defendant's BAC was between 0.25 and 0.27 immediately after Defendant left Tin Roof.

Dr. Alexander stated the following about his professional experience with the effect of alcohol on individuals:

> Alcohol use is very widespread in our country, and alcohol abuse is also widespread. And, with that, the interface with psychiatry and alcohol occurs in every phase of practice that I've ever had. So whether it's an outpatient private practice, outpatient in a drug and alcohol clinic, which I've worked there. I've worked in patient drug and alcohol units. For twelve years, I was the medical director of a very large state psychiatric hospital. We had many, many people that were admitted to the hospital with different levels of intoxication. And I also served as the night call physician one night a week for a number of years. So, I would see the people as they were brought in by the police and see the effects directly of what level of alcohol.

> Also, in the last ten or eleven years, I've worked in two different general hospitals. So, we don't have any psychiatric unit, but we see people that overdose on alcohol or get ill enough medically to come in for alcohol withdrawal. And we see people with blood alcohol levels at just about any range, but even as high as .5, .6.

Dr. Alexander stated that he had treated "many thousands" of patients whose cases "involve[d] alcohol and the effects of all alcohol[.]"

Dr. Alexander also learned that Defendant had sustained concussions in high school as well as his freshman year of college. Additionally, Defendant suffered another possible concussion shortly before the offenses during a motor vehicle accident. Dr. Alexander testified that, although he did not have any of Defendant's medical

records on these concussions, head injuries were "a factor that would have to be considered in this situation." He explained that the symptoms of alcohol consumption would be "exacerbated or worsened" in a person with a previous head injury. Further, Dr. Alexander stated that Defendant was "a new drinker" who would have likely displayed the following symptoms at a BAC of 0.22: "being uncoordinated, unbalanced, slurred speech, difficulty making decisions, difficulty perceiving the environment, difficulty assessing situations, [and] basically dysfunction of the brain." Dr. Alexander testified that, in his professional opinion and to a reasonable degree of medical certainty, the Defendant's decision-making ability was impaired at the time of the offenses. More specifically, Dr. Alexander explained that Defendant "would not have been cognizant enough to be able to form intent or to have more than first order thinking."

On cross-examination, Dr. Alexander stated that Defendant retained his services in early- to mid-April 2016. Dr. Alexander testified that he was not board-certified in toxicology or neuropharmacology. He could not specifically describe any training he had received in toxicology after medical school. He stated that he did not normally prepare reports like the one he prepared for Defendant. Dr. Alexander agreed that he based his opinion and report on information given to him by defense counsel, namely, an email with "a series of questions" and Defendant's answers to the questions; he did not interview Defendant. Dr. Alexander testified that he did not have enough information to determine whether Defendant was malingering. He also stated that he did not review video surveillance of Defendant's actions on the night of the offenses prior to composing his report.

The trial court noted that the State did not have an opportunity to retain an expert to rebut Dr. Alexander's findings. The trial court also noted that neither the State nor the defense asked an expert to evaluate Defendant. Further, the trial court found that Dr. Alexander was an expert in psychiatry and "did not demonstrate any particular expertise in the field of toxicology," which the trial court found to be "extremely important." Additionally, the trial court found that Dr. Alexander's "conclusions and opinions were based upon information supplied by defense counsel as admitted in the form of an e-mail and not based upon any scientific information or documented information or any particular evaluation that he had provided." Therefore, the trial court concluded that "the underlying facts indicate[d] a lack of trustworthiness in this particular case[,]" and the trial court held that Dr. Alexander's testimony should be excluded.

….

A defendant's right to present his own witnesses to establish a defense constitutes a fundamental element of due process and is protected by the Compulsory Process Clause of the Sixth Amendment. *Washington v. Texas*, 388 U.S. 14, 19 (1967). "... *Washington v. Texas* clearly established that, under the Sixth Amendment, a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense." *Davis v. Straub*, 430 F.3d 281, 290 (6th Cir.

2005) (citing *Washington*, 388 U.S. at 23). Government conduct that rises to the level of "substantial interference" with a witness's "free and unhampered determination to testify" violates this right. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997); *see, e.g., Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam) (reversing the defendant's conviction when the trial court severely admonished the sole witness proffered by the defense who declined to testify as a result); *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973) (reversing a conviction obtained after a Secret Service agent, in an ex parte communication, advised a defense witness of possible prosecution if he testified). Even when such interference occurs, however, a violation of a defendant's right to call witnesses in his defense is subject to harmless error analysis. *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001); *Foster*, 128 F.3d at 953 & n. 4.

However, a defendant's right to present witnesses is not absolute:

> In appropriate cases, the right must yield to other legitimate interests in the criminal trial process. Specifically, [i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. However, these procedural and evidentiary rules of exclusion may not be applied mechanistically to defeat the ends of justice. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.

*State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (internal citations and quotation marks omitted) (alteration in original). In determining whether a defendant's right to present a defense has been violated by the exclusion of evidence, courts should consider whether "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id*. at 433-34 (citing *Chambers v. Mississippi*, 410 U.S. 284, 298-301 (1973)).

The United States Supreme Court has recognized that an exclusion of evidence is unconstitutional when it "significantly undermine[s] fundamental elements of the accused's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998). The question of whether excluded evidence is critical to a defense is a fact-specific inquiry. *See Chambers*, 410 U.S. at 303.

### 1. Evidence critical to the defense

In this case, Dr. Alexander's testimony on Defendant's approximate BAC at the time of the offenses would have assisted in establishing Defendant's theory of the case—that his high level of intoxication prevented him from knowingly participating in the offenses and thus being criminally responsible. Dr. Alexander testified that, in his professional opinion and to a reasonable degree of medical

25

certainty, the Defendant's decision-making ability was impaired at the time of the offenses. More specifically, Dr. Alexander explained that Defendant "would not have been cognizant enough to be able to form intent or to have more than first order thinking." Thus, we conclude that Dr. Alexander's testimony was critical to Defendant's trial strategy. However, even though Dr. Alexander's testimony was critical to the defense, we must examine the other factors relevant to the consideration of whether the exclusion of Dr. Alexander's testimony violated Defendant's right to present a defense.

## 2. Sufficient indicia of reliability

As stated previously in this opinion, the trial court excluded Dr. Alexander's testimony because "the underlying facts indicate[d] a lack of trustworthiness" and because Dr. Alexander "did not demonstrate any specialized expert opinion[,] knowledge[,] or training regarding toxicology[,]" "relied on information supplied via email by defense counsel[,]" and "did not base any opinion on data, documentation or scientific evidence." Dr. Alexander relied on self-serving and uncorroborated statements from Defendant to calculate Defendant's approximate BAC during the offenses. Thus, we agree with the trial court that Dr. Alexander's proposed testimony and conclusions were unreliable, and we give this factor considerable weight.

## 3. Interest supporting exclusion

In this case, the interests supporting exclusion are the interests behind Tennessee Rule of Evidence 703, which was discussed previously in this opinion. Further, we have previously determined that the trial court properly exercised its discretion under Rule 703 to exclude Dr. Alexander's testimony. Thus, the interests behind Rule 703 support the exclusion of Dr. Alexander's testimony. Because we have previously concluded that Dr. Alexander's testimony was unreliable, we also conclude that Defendant has not established that the trial court's exclusion of Dr. Alexander's testimony violated his Sixth Amendment right to present witnesses. *See State v. Joshua Hunter Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *42-44 (Tenn. Crim. App. Oct. 6, 2017), no perm. app. filed.

*Vandenburg*, 2019 WL 3720892, at *28-33 (footnotes omitted).

As shown, the TCCA weighed the three *Chambers* considerations and decided that, based upon the record, the trial court appropriately excluded Dr. Alexander's expert testimony regarding Vandenburg's intoxication and its effect on his ability to form criminal intent. *See Vandenburg*,

2019 WL 3720892, at *33.  The TCCA first decided, and Vandenburg agrees,[3] that Dr. Alexander's proposed testimony "was critical to the defense." *Id*.  But, Vandenburg disagrees with the TCCA's holdings that Dr. Alexander's proposed testimony about his conclusions were unreliable and that the "interests supporting exclusion [under] Tennessee Rule of Evidence 703" outweighed Vandenburg's interest in presenting the testimony for his defense. *Id*.

On the second consideration, the TCCA determined that Dr. Alexander's testimony "indicated a lack of trustworthiness" because he did not examine Vandenburg, demonstrated no "specialized expert opinion[,] knowledge[,] or training[,] regarding toxicology[,]" "relied on information supplied via email by defense counsel[,]" and "did not base any opinion on data, documentation, or scientific evidence." *Vandenburg*, 2019 WL 3720892, at *33.

Importantly, Dr. Alexander was not "certified in toxicology or neuropharmacology, did not receive specific training" in these areas, and typically did not opine on these matters as he tried to here. *Id*. at *32.  Although Vandenburg alleges that the state courts violated his defense right by erroneously recategorizing the proposed expert testimony as solely concerning "toxicology" rather than "psychiatry," (*see* ECF 1-1, Page ID# 22-25), he had to show that Dr. Alexander's psychiatric expertise included general toxicology study and specifically that Alexander reliably studied the effects of Vandenburg's intoxication on his mental state during the crimes, which he did not. *Vandenburg*, 2019 WL 3720892, at *31-33.  After all, evidentiary rules do not allow "a scientist, however well credentialed he may be, . . . to be the mouthpiece of a scientist in a different specialty." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (applying Federal Rule of Evidence 703); *accord In re ConAgra Peanut Butter Prod. Liab. Litig.*,

---

[3] He claims that the TCCA concluded "in the first prong" that the exclusion "violated" his constitutional defense right, although it is apparent Vandenburg misplaced his language by his disagreement with the resolution of prongs two and three.  (ECF 1-1, Page ID# 24.)

No. 1:07-MD-1845, 2011 WL 6960816, at *2 (N.D. Ga. Apr. 7, 2011); *see also* Wright and Gold, *Federal Practice and Procedure* 6274 (expert proof may be denied where "the witness is not an expert in that field, [and] can only parrot and not critically evaluate those findings"). Simply put, Vandenburg cannot smuggle expert toxicology proof into his defense under the guise of Dr. Alexander's admitted psychiatric expertise. While Dr. Alexander was qualified in psychiatry, he lacked expertise in toxicology, meaning he could not testify to that scientific matter merely because he was a general psychiatric expert.

Vandenburg also takes issue with the state courts' conclusion that Dr. Alexander's proposed testimony that was based on untrustworthy, non-scientific, "self-serving and uncorroborated statements" from Vandenburg communicated through Counsel. (*See e.g.*, ECF 1-1, Page ID# 24.) Vandenburg claims the TCCA's characterization of Dr. Alexander's study was "not only misplaced, but completely unreasonable and outrageous." (ECF 1-1, Page ID# 24.) Yet, Vandenburg fails to appreciate that courts must "examine the reliability of those sources" of information upon which an expert bases his opinion. *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1244 (E.D.N.Y. 1985). "If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *Id*. at 1245; *see MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 781 (N.D. Ohio 2013) (quoting *Agent Orange*); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 823 (N.D. Ohio 2011) (same). So, contrary to Vandenburg's assertion, it would be "outrageous" for a trial court to permit introduction of Dr. Alexander's proposed testimony, given the sheer lack of reliability and scientific examination underlying it.

These findings inform the TCCA's opinion on the third *Chambers* consideration, where it held that the interests behind the state rule of evidence governing introduction of expert testimony

outweighed Vandenburg's defense right. As described above, Dr. Alexander's proposed testimony "was unreliable" for many reasons. *Vandenburg*, 2019 WL 3720892, at *33. Indeed, Dr. Alexander lacked any expertise about toxicology related to psychiatry generally while specifically basing his proposed testimony on passed-along information "given to him by defense counsel" through "an email with a series of questions and [Vandenburg's] answers to the questions." *Id.* at *31, *33. In no way do any of these facts establish specialized expert knowledge of the subject matter or any indicia of reliability of scientific study conducted on this issue.

Turning to AEDPA, Vandenburg again does not argue the claim in § 2254(d) terms as he merely disagrees with the TCCA's holdings. (ECF 1-1, Page ID# 20-26.) "[M]ere disagreement with the [state] court's conclusions is not enough to warrant habeas relief." *Boyd v. Minnesota*, 274 F.3d 497, 500 (8th Cir. 2001). Vandenburg must instead show that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court precedents" or its factual findings are not supported by the record. *Bailey v. Myrick*, 467 F. Supp. 3d 950, 954-55 (D. Or. 2020); *see Carter*, 900 F.3d at 768. Because Vandenburg has done neither, the Court may summarily dismiss his claim.

Regardless, the decision does not offend either § 2254(d)(1) clause. The state-court decision contradicted no controlling federal precedents governing Vandenburg's right to present a defense because it correctly identified and applied these precedents to the facts. *Vandenburg*, 2019 WL 3720892, at *32-33. In so doing, the TCCA wrote a "run-of-the-mill" decision "applying the correct legal rule . . . to the facts." *Williams*, 529 U.S. at 406. It therefore "fit[s] comfortably within § 2254(d)(1)'s contrary to clause." *Id.*

The TCCA's decision also does not offend the unreasonable-application clause. Importantly, this Court's evaluation of a state court's legal rule application "requires considering

29

the rule's specificity." *Gagne v. Booker*, 680 F.3d 493, 514 (6th Cir. 2012) (quoting *Richter*, 562 U.S. at 101). "The more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." *Id*. (quoting *Renico v. Lett*, 559 U.S. 766, 776 (2010)). Considering the "arbitrary or disproportionate" standard for evaluating defense-right claims, *Scheffer*, 523 U.S. at 308, the contours of a defendant's right to present a defense are quite "general" and allow "more leeway" for state courts to reach different outcomes. In fact, "[o]nly rarely ha[s] [the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).

Here, Vandenburg failed to show that the TCCA's decision was "so lacking in justification" to warrant habeas corpus relief. *Donald*, 575 U.S. at 316. The TCCA thoroughly evaluated the trial court's proper exercise of discretion when denying the request by balancing Vandenburg's "critical" need for the evidence against the state evidentiary rules' interest in shielding the jury from proffered unreliable evidence. *Vandenburg*, 2019 WL 3720892, at *33.

Liberally construed, Vandenburg's argument presents mere disagreement with the state courts' resolution of the claim. (ECF 1-1, Page ID# 20-26.) Unbeknownst to him, the argument confirms the lack of unreasonable application of federal law here. Indeed, perhaps a reasonable jurist could disagree with the TCCA's application of federal law and find the proposed testimony reliable and that Vandenburg's interest in presenting it to support his defense outweighed any exclusionary interest. But § 2254(d)(1) requires that there be "no possibility fairminded jurists could disagree" that the state-court decision offends federal law. *Richter*, 562 U.S. at 102. At

30

minimum, Vandenburg's argument of TCCA error, which flies in the face of common evidentiary law, fails to meet this standard.

On that point, Vandenburg's argument amounts to an assertion that he possessed an unfettered right to present this evidence with no guardrails. He claims it was "completely unreasonable and outrageous" that the state courts denied his request for Dr. Alexander to testify based on, in his opinion, "so called self-serving and uncorroborated statements from [him]" and the fact that Dr. Alexander lacked any "knowledge and training in toxicology[,]" which clearly was a substantial point of his offer of proof. (ECF 1-1, Page ID# 24.) Yet, a "complete defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions." *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (internal quotation mark omitted). Vandenburg "must [have] complied with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*. (quoting *Chambers*, 410 U.S. at 302). And here, the state courts examined the record and decided he did not so comply, and its sound decision reflects no "extreme malfunction[] in the state criminal justice system[,]" warranting habeas corpus relief. *Richter*, 562 U.S. at 103.

Relief under § 2254(d)(2) is also barred. Vandenburg agrees with the factual determinations underlying the TCCA's legal decisions since he supports his legal arguments with the state court's recitation of the facts. *Compare Vandenburg*, 2019 WL 3720892, at *28-31; (ECF 1-1, Page ID# 20-26.) Since he seemingly agrees with the facts underlying the decision, he certainly has produced no clear and convincing evidence to rebut the presumption of correctness afforded the factual determinations. § 2254(e)(1). Thus, this Court must presume them to be true. *Armstrong*, 372 F.3d at 781-83.

Vandenburg is entitled to no relief on Ground Two.

**B. The TCCA's Holding that the Trial Court Did Not Violate Vandenburg's Defense Right by Excluding a Voicemail Withstands AEDPA Scrutiny Because, although the Voicemail was Excluded, Vandenburg Still Highlighted Evidence of His Intoxication.**

Vandenburg also claims that he is entitled to habeas corpus relief from the TCCA's decision that affirmed the trial court's exclusion of a voicemail. (ECF 1-1, Page ID# 32-35.) He claims the exclusion violated his right to present a defense under the Sixth Amendment. (ECF 1-1, Page ID# 32-35.) Vandenburg properly exhausted the federal constitutional claim on direct appeal, and the TCCA addressed it as follows:

> Defendant argues that the trial court erred in excluding Defendant's voicemail on Mr. Quinzio's cell phone from evidence on the basis that it was self-serving hearsay under *Hall v. State*, 552 S.W.2d 417 (Tenn. Crim. App. 1977). He asserts that the message was not exculpatory and that he sought to introduce the statement to "corroborate [Mr.] Quinzio's interpretation of the message." Thus, he argues that he was not introducing the voicemail to prove the truth of the matter asserted but "to show the basis upon which [Mr.] Quinzio believed [Defendant] was intoxicated." Further, Defendant contends that the trial court's exclusion of the voicemail violated his right to present a defense.

> The State responds that the trial court properly acted within its discretion by excluding Defendant's self-serving hearsay statement because Defendant did not testify and the statement was offered "to show that the defendant was not engaged in the acts against the victim." Additionally, the State argues that, even if the trial court erred in excluding the statement, the error was harmless because of the overwhelming evidence of Defendant's guilt and because "evidence of the defendant's intoxication was admitted at trial[.]"

> During Defendant's cross-examination of Mr. Quinzio, defense counsel asked the trial court to play a recording of a voicemail that Defendant left on Mr. Quinzio's phone. The State objected, and the following exchange occurred:

>> THE [TRIAL] COURT: Well, you know, statements of a defendant, self-serving statements, unless he testifies, they -- and is under *Hall*. You wanted to come back to say what?

>> [DEFENSE COUNSEL]: We don't have any way to play the statement, unfortunately. But Mr. Quinzio testified when this call was made [Defendant] was speaking gibberish, that he can barely understand. This is not a self-serving statement. What [Defendant] says in the statement is --

[THE STATE]: We're talking about two different statements, then. It's the one that was given, when he called him during the incident. The other one he called him after the incident, according to the timeline.

....

[THE STATE]: So, there's two. The one where he's talking gibberish is when he called him the first time.

You could understand the one you're talking about. It's not gibberish.

[DEFENSE COUNSEL]: But, at any rate, actually, the one I wanted to play was the voicemail. I apologize if I wasn't –

THE [TRIAL] COURT: And what's the content of it?

[DEFENSE COUNSEL]: The content of the voicemail -- and, again, I apologize to the ladies that are present -- but, [Defendant] says: "They're pissing on her p[***]y. They're pissing on her p[***]y." He says that, "Joey, please, you've got to call me, I'm in deep s[**]t." And he sounds very intoxicated in that phone call, and that's the purpose of playing the phone call. He's not on there saying: "I didn't do anything, I didn't have anything to do with this." It's not self-serving. It's actually an admission that he was present.

[THE STATE]: It's still a violation of *Hall*.

[DEFENSE COUNSEL]: And it, also, forms a foundation for Mr. Quinzio's opinion that he was drunk ....

THE [TRIAL] COURT: Well, it appears to be self-serving to me, if it is a statement demonstrating that ... somebody else is doing something to her, which is causing me trouble, that is sort of self-serving.

[DEFENSE COUNSEL]: But, Your Honor, in the first trial, the State was allowed to play the last half of that statement, where he says: "Call me I am in deep s[**]t."

[THE STATE]: Yeah, the State has the right to play it any time we want to.
....

[DEFENSE COUNSEL]: The first part of it wasn't played, because it was being tried with [Co-defendant] Batey. My point is, it's not a self-serving statement. It is a statement that Mr. Quinzio heard, can identify his voice, and that is part of what he based his opinion on that he was intoxicated.

33

[THE STATE]: It makes no difference. The statement by a party opponent can only be put in by us.

THE [TRIAL] COURT: And that is so very, very true.

[THE STATE]: I mean, he can testify he received two calls, and based on those he had an opinion he was drunk, without having to get into what was said.

THE [TRIAL] COURT: That is, also, true. But, any statements he made -- the State has a right to play it. You really don't.

On redirect examination, Mr. Quinzio agreed that he could understand the words that Defendant said during the voicemail he left on Mr. Quinzio's phone. On recross-examination, defense counsel asked Mr. Quinzio if he remembered the words that Defendant stated on the voicemail. The State objected on the ground that the content of the voicemail was precluded under *Hall*. The trial court sustained the objection. A CD of the voicemail recording was later admitted as Exhibit 62 for identification.

The CD recording of the voicemail that Defendant left on Mr. Quinzio's phone contains the following message: "First of all, he was pissing on her p[***]y. He was pissing on her. Hold on, hold on. [muffled noise/unintelligible] Dude, you gotta call me back bro. I'm in deep s[**]t. You gotta call me back. [muffled noise/unintelligible]"

…

We additionally conclude that the trial court's exclusion of the voicemail did not violate Defendant's right to present a defense. As noted in our summary of the evidence, Mr. Quinzio testified that Defendant called him early in the morning of June 23 and that, during the phone call, Defendant sounded intoxicated. Mr. Quinzio told Detective Mayo that he had never seen Defendant that intoxicated and that Defendant was not a big consumer of alcohol. He also told Detective Mayo that he knew "what was going on[,]" that it "was wrong[,]" but that Defendant did not. Thus, Defendant clearly presented evidence through Mr. Quinzio's testimony that he was intoxicated during the offenses. Defendant is not entitled to relief on this ground.

*Vandenburg*, 2019 WL 3720892, at *44-46.

But for cursory recitations of the AEDPA standard of review at the beginning and end of the argument, Vandenburg once again failed to address the claim under § 2254(d). (ECF 1-1, Page ID# 32-35.) He instead concentrates on proving that the state courts erred in excluding the

34

evidence under Tennessee hearsay law, thus violating his right to present a defense. (ECF 1-1, Page ID# 32-35.) But his argument is another error-correction argument, *Hale*, 122 F.4th at 645, and thus, the Court may summarily dismiss it. *Hank*, 2014 WL 4626456, at *3.

Regardless, the TCCA's adjudication does not contradict clearly established federal law governing the right to present a defense. While Vandenburg faults the TCCA for not "support[ing] its conclusion [with] any federal authority[,]" the TCCA was not obligated to cite clearly established federal law in its decision. (ECF 1-1, Page ID# 34.) A state court need not even be aware of the governing Supreme Court precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Packer*, 537 U.S. at 8. Nevertheless, the opinion shows that Vandenburg's assertion that the TCCA did not support its decision with federal authority is plainly inaccurate. Indeed, the TCCA correctly cited governing federal precedent—*Chambers*, *Washington*, and *Scheffer* among other cases—concerning Vandenburg's defense right earlier in its decision. *See Vandenburg*, 2019 WL 3720892, at *32-33. Thus, the TCCA's decision is "run-of-the-mill" and does not offend the contrary-to clause. *Williams*, 529 U.S. at 406.

The state court's decision also involved no unreasonable application of clearly established federal law. Vandenburg renews his state-court argument that he sought introduction of the voicemail "to show the jury that he was too intoxicated to be criminally responsible for the conduct of the co-defendants." (ECF 1-1, Page ID# 34.) Yet, as the TCCA aptly observed, Vandenburg still managed to present his intoxication defense through Mr. Quinzio's testimony without the voicemail. *Vandenburg*, 2019 WL 3720892, at *46. Indeed, Mr. Quinzio testified that he listened to Vandenburg's voicemail and spoke with Vandenburg on June 23 early in the morning. *Id*. at *10-11. Mr. Quinzio acknowledged that Vandenburg "sounded intoxicated" and that he told Detective Mayo that he "had never seen [Vandenburg] that intoxicated" because he was not a big

drinker. *Id.* at \*11; (*see* ECF 16-47, Page ID# 5786-92.)  Most notably, while Mr. Quinzio knew "what was going on" and that it "was wrong," he thought Vandenburg was oblivious due to his drunkenness. *Id.*  Indeed, Vandenburg apparently asked Mr. Quinzio to send him the videos taken of the sexual assaults because Vandenburg "did not remember what had occurred." *Id.*; (ECF 16-47, Page ID# 5791-92.)

As shown, the voicemail's exclusion did not violate Vandenburg's right to present a complete defense.  He "was able to explore [his] theory" of intoxication "and present it to the jury" through Mr. Quinzio's testimony.  *Compare U.S. v. Lucas*, 357 F.3d 599, 606-07 (6th Cir. 2004) (introduced witnesses' and defendant's testimonies established defense that another person was "the culprit"); *see also Wynne v. Renico*, 606 F.3d 867, 870-71 (6th Cir. 2010) (no denial of defense right where defendant "introduced considerable non-propensity-based evidence in support of the Peckham-did-it defense" although Rule 404(b) evidence was barred).  Because Vandenburg still presented his intoxication defense without the voicemail, the state courts reasonably applied clearly established federal law when it held that the exclusion of the voicemail did not violate his defense right.

Vandenburg attempts to show that the trial court erred when excluding the voicemail as inadmissible hearsay before concluding that this exclusion prevented him from "show[ing] the jury that he was too intoxicated to be criminally responsible[.]"  (ECF 1-1, Page ID# 32-34.)  But his argument plainly overlooks Mr. Quinzio's testimony that established the information that Vandenburg claims only the voicemail could—his extreme intoxication that prevented him from forming criminal intent.  Put simply, the TCCA did not unreasonably apply clearly established

federal law governing the right to present a defense when it aptly noted Vandenburg's defense presentation.[4]

Finally, Vandenburg's omission of the fact that Mr. Quinzio testified to the information for which Vandenburg sought introduction of the voicemail bars habeas relief under § 2254(d)(2). By omitting this fact, Vandenburg has not shown that the record "compel[s] the conclusion that the [TCCA] had no permissible alternative but to arrive at a contrary conclusion" on the Sixth Amendment question. *Carter*, 900 F.3d at 768 (internal quotation marks omitted). The record more than supports Mr. Quinzio's testimony regarding Vandenburg's intoxication and Quinzio's belief that Vandenburg could not form intent. (*See generally* ECF 16-47, Page ID# 5786, 5790-91.) Accordingly, the TCCA's decision was not "based on an unreasonable determination of the facts in light of" the record. § 2254(d)(2).

The Court should deny relief on Ground Four.

### C. Ground Seven's Two-Paragraph Conclusory Allegation Provides No Relief Because it Certainly Shows No Contradiction, or Unreasonable Application of, Clearly Established Federal Law, or that the TCCA Based its Decision on an Unreasonable Determination of the Facts.

With no analysis beyond a conclusory allegation, Vandenburg asserts that the trial court denied him the right to present a defense by barring evidence of E.L.'s "sexual behavior towards" him.[5] (ECF 1-1, Page ID# 41.)

---

[4] To the extent Vandenburg claims hearsay error under the Tennessee Rules of Evidence, that claim is not cognizable because it individually fails to allege that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) ("In general, alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review.").

[5] Vandenburg argues nothing concerning the exclusion of the evidence relating to "DNA evidence from two unknown males found on E.L.'s underwear[.]" *Vandenburg*, 2019 WL 3720892, at *84. Thus, this part of the claim raised in state court will not be discussed.

The TCCA addressed this Sixth Amendment claim on direct appeal as follows:

On September 15, 2014, Defendant filed a motion under Tennessee Rule of Evidence 412, arguing that the trial court should admit evidence of E.L's sexual behavior with Defendant to explain the source of DNA found at the crime scene and to establish E.L's pattern of behavior and sexual consent. Specifically, Defendant alleged, in pertinent part:

> • Defendant met E.L. while he visited Vanderbilt University on a recruiting trip; Defendant and E.L. both attended a party where E.L. hugged and kissed Defendant and grabbed his penis.

> • On June 15, 2013, Defendant's twentieth birthday, E.L. initiated sex with Defendant in his dorm room. After E.L. and Defendant had sex, Mr. Boyd entered Defendant's dorm room and E.L. invited Mr. Boyd to have sex with her while Defendant was still in the bed.

> • On June 22, 2013, E.L. texted Defendant around 1 a.m. and invited Defendant to come to her apartment to have sex with her.

> • After E.L. arrived at Tin Roof and met up with Defendant, she initiated sexual contact with him in a photo booth. Later, E.L. danced in a sexual manner between Defendant and another football player. She told Defendant that she wanted to have sex with him and that she wanted him to take photographs of her so she could remember the evening.

> • During the cab ride from Tin Roof to E.L.'s apartment, E.L. inserted Defendant's fingers into her vagina.

> • E.L. engaged in consensual sex with Defendant on the evening of June 23.

> • On June 24, 2013, E.L. posted the following statement on her Twitter account: "'So have you girls ever been in a hot tub with three brothas before?' Lollllll[.]"

> • Analysis of the underwear that E.L. wore during the offenses showed the presence of DNA from two unidentified males.

On October 8, 2014, the trial court held a hearing on Defendant's Rule 412 motion. Regarding his previous sexual contact with E.L., Defendant testified that E.L. twice asked Defendant to take nude photographs of her—once during sex on June 15 and again on the evening of June 21. Defendant testified that around 1:00 a.m. on June 22, 2013, E.L. texted Defendant to ask him to come over to her apartment. After Defendant arrived at E.L.'s apartment, they had consensual sex, during which E.L. told Defendant that "she liked having nude photos of herself taken" and that "she

liked having nude photos of guys that she's been with." E.L. did not ask Defendant to take photos of her at that time. However, Defendant stated that he and E.L. planned to take nude photographs of each other to celebrate his birthday.

While at Tin Roof on the evening of June 22, 2013, Defendant and E.L. discussed having sexual intercourse later that night. Defendant stated that E.L. handed him a drink and said, "You need to relax and get ready for tonight." Defendant interpreted her statement as meaning that she wanted him to return with her to her apartment to have sex. He stated that E.L. later confirmed this interpretation because she said, "I can't wait to f[**]k you tonight. Your body is so sexy." Defendant stated that E.L. grabbed his buttocks and genital area, kissed him, and danced in a sexual manner with him and another football player. Defendant stated that, shortly after dancing, E.L. indicated to him that she wanted to return to her apartment and have sex with him. E.L. told Defendant that she could not wait to have sex with him. Defendant and E.L. left Tin Roof around 1:55 a.m. on June 23. In the cab on the way to E.L.'s apartment, she placed Defendant's hand on her genital area and again stated that she could not wait to have sex with him. The cab driver dropped Defendant and E.L. off in front of her apartment at the Village at Vanderbilt. While E.L. and Defendant walked up to her apartment, she again grabbed his buttocks and genital area, kissed his ear, and whispered to him that she wanted to have sex all night long.

During cross-examination, Defendant testified that E.L. last told him that she wanted to have sex with him while they were driving from her apartment building to Gillette Hall. He explained that he told Mr. Black that he did not take any photographs or videos of E.L. on the morning of June 23 because he was intoxicated during the offenses and did not recall taking videos and photographs. Defendant asserted that E.L. consented to having sex with him less than thirty minutes before the offenses occurred.

E.L. testified that she did not remember the total number of alcoholic beverages that she consumed on the evening of June 22, 2013. She also did not recall riding in a cab with Defendant from Tin Roof to her apartment that evening. E.L. stated that she never gave consent to Defendant to take nude photographs of her or to disseminate nude photographs of her. E.L. recalled sending a tweet to Ms. Miller on June 24, 2013, that contained the quote " 'So have you girls ever been in a hot tub with three brothas before?' Lollllll[.]" E.L. explained that on June 24, she was hanging out with Ms. Miller at Madison Jenson's apartment complex. The three women were in the hot tub at the complex, and three strangers approached the women and asked, "So, have you girls ever been in a hot tub with three brothers before?" E.L. and her friends thought that the question was strange, so she tweeted the question to make fun of it. E.L. did not recall having sex with anyone on June 22, and she did not have sex with anyone between the time she left Defendant's dorm room around 8:00 a.m. on June 23 and when she changed her clothes later that day.

The DNA report prepared by the TBI that was admitted at the hearing showed that the TBI tested two pairs of underwear from E.L. Examination of one pair "confirmed the presence of a limited amount of spermatozoa." The pairs of underwear were additionally submitted to DNA testing by Cellmark Forensics, whose report concluded that "[t]he Y-STR profile obtained from the underwear [non-sperm fraction] DNA extract [wa]s a mixture of at least two males including a major unknown male donor." Defendant, his co-defendants, Mr. Woods, Mr. van der Wal, Mr. Retta, Mr. Boyd, and Mr. Prioleau were excluded as major contributors to this DNA extract. Cellmark also tested "[t]he partial Y-STR profile obtained from the underwear [sperm fraction] DNA extract" and found that the DNA was "a mixture consistent with originating from two males." Cellmark excluded Mr. Woods, Mr. van der Wal, Defendant, and Co-defendant Batey as contributors but was unable to make any determinations regarding whether Co-defendant Banks or McKenzie were contributors.

On October 14, 2014, the trial court denied Defendant's Rule 412 motion. In its written order, the trial court concluded that Defendant "did not present any specific evidence that related to the victim's consent, therefore[,] any other evidence related to the victim's consensual sexual history is immaterial and protected by Rule 412." Additionally, the trial court determined that Defendant did not present sufficient evidence to establish that E.L. had a distinctive pattern of behavior "to satisfy an exception to Rule 412." The trial court stated that, "[s]ince none of the exceptions apply, the Court need not make a determination of whether the probative value of the evidence outweighs the unfair prejudice to the victim." Lastly, the trial court found that, while Defendant argued that the exclusion of evidence of E.L.'s prior sexual behavior violated his constitutional right to present a defense, "no credible evidence was presented to support [his] contention."

Prior to May 2016, the State filed a motion to redact Defendant's statement by omitting references to specific instances of sexual activity between Defendant and E.L. Defendant filed a response to this motion and argued that redaction of his statement would violate his due process rights to confront the witnesses against him and to present a defense. Additionally, Defendant argued that specific instances of E.L's sexual behavior were admissible under Rule 412 to rebut the State's theory of prosecution. On May 18, 2016, the trial court granted the State's motion to redact Defendant's statement by omitting references to E.L.'s previous sexual activity.

…

Finally, Defendant contends that the exclusion of evidence of E.L.'s prior sexual behavior deprived him of his constitutional right to present a defense. The State responds that Defendant's right to present a defense was not violated by the exclusion of this evidence because "the evidence bears little indicia of reliability and the interest supporting its exclusion is substantially important." The State also argues that "[b]ecause ... [D]efendant did not claim that the victim consented to the acts, the evidence was not critical to his defense[.]" In his reply brief, Defendant

asserts that E.L.'s statements to Defendant are "analogous to admissions by a party-opponent and would possess inherent reliability."

In some situations, admission of evidence of a victim's prior sexual behavior may be "[r]equired by the Tennessee or United States Constitution[.]" Tenn. R. Evid. 412(c)(1).

> Although [t]he right to present witnesses is of critical importance ... it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process. Specifically, [i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. However, these procedural and evidentiary rules of exclusion may not be applied mechanistically to defeat the ends of justice. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.

*Brown*, 29 S.W.3d at 432-33 (internal citations and quotation marks omitted) (alterations in original). "In determining whether a defendant's right to present a defense has been violated by the exclusion of evidence, courts should consider whether "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* at 433-34 (citing *Chambers*, 410 U.S. at 298-301).

We conclude that the trial court's exclusion of evidence of E.L.'s prior sexual behavior did not violate Defendant's right to present a defense. The evidence proffered by Defendant, that E.L. consented to having sexual intercourse with Defendant prior to the offenses and DNA evidence from two unknown males found on E.L.'s underwear, was not critical to Defendant's defense. As stated earlier in this opinion, Defendant was charged for aggravated rape under a theory of criminal responsibility and not for his direct actions. Defendant stated numerous times to police and Vanderbilt officials that he did not have sexual contact with E.L. on the night of the offenses. As stated in his appellate briefs, Defendant's main goal at trial was to rebut the State's theory that he was the "ringleader" or organizer of the offenses by asserting that he and E.L. had an ongoing sexual relationship. Because the State charged Defendant under a theory of criminal responsibility for the offenses, Defendant's assertion that E.L. consented to have sexual intercourse with him shortly before the offenses occurred was not critical to his defense because it would not have rebutted any essential element of the crime of aggravated rape as charged. Similarly, DNA evidence of two unidentified males on E.L.'s underwear would not have exculpated Defendant from being criminally responsible for aggravated rape. Further, Defendant's testimony that E.L. said she wanted to have sex with him would not have exculpated him for his actions of taking explicit photographs of E.L. while she lay unconscious on the floor and of encouraging his

41

co-defendants to rape and sexually batter her. For these reasons, these pieces of evidence were not critical to Defendant's defense at trial.

Second, Defendant's hearsay assertion that E.L. consented to have sex with him shortly before the offenses occurred does not bear "sufficient indicia of reliability[.]" *See id.* at 433-34. Although Defendant asserts that E.L.'s comments consenting to have sex with Defendant should be treated as party-opponent statements, *see* Tennessee Rule of Evidence 803 (1.2), we decline to expand this exception to the hearsay rule to encompass victims of sexual offenses. *See State v. Flood*, 219 S.W.3d 307, 314 (Tenn. 2007) ("[A] victim in a criminal case does not meet the definition of a 'party.'"); *see also State v. Howard*, 504 S.W.3d 260, 277 n.6 (Tenn. 2016). Moreover, because Defendant's testimony that E.L. verbally consented to having sex with him multiple times throughout the evening of June 22 and early morning of June 23 is self-serving, this testimony is unreliable hearsay that does not fall under any exception. *See Dotson*, 254 S.W.3d at 394. Consequently, we conclude that the exclusion of E.L.'s comments and DNA from two unidentified males did not violate Defendant's right to present a defense.

*Vandenburg*, 2019 WL 3720892, at *80-82, *84-85.

Preliminarily, the Court may dismiss the claim for two interrelated reasons. First, Vandenburg asserts only a conclusory allegation that the TCCA's affirmation of the trial court's denial of his Rule 412 motion entitles him to habeas corpus relief. (ECF 1-1, Page ID# 41.) Because conclusory allegations "are insufficient to state a constitutional claim[,]" this claim fails. *Wogenstahl v. Mitchell*, 668 F.3d 307, 343 (6th Cir. 2012). Second, the conclusory error assertion and bald recitation of the AEDPA standards do not properly plead this claim in habeas corpus terms, again warranting summary dismissal. *Hank*, 2014 WL 4626456, at *3.

Although these preliminary points justify dismissal, the TCCA's decision satisfies AEDPA scrutiny. The TCCA cited *State v. Brown*, 29 S.W.3d 427, 432-34 (Tenn. 2000), a state-court decision that incorporated *Chambers* and *Scheffer*, into its analysis. *Vandenburg*, 2019 WL 3720892, at *84. Thus, the TCCA did not decide the issue in a "diametrically different" manner than these federal precedents, meaning it is not "contrary to" them. *Williams*, 529 U.S. at 405-06; *compare Haddix v. Meko*, No. 5:15-31, 2015 WL 7871174, at *4 n.4 (E.D. Ky. Dec. 4, 2015)

("Kentucky Supreme Court cited to a state court decision that cited the" correct federal law). The question now becomes "whether [the state] court unreasonably applied [the federal law] to the facts presented." *Haddix*, 2015 WL 7871174, at *4.

The TCCA aptly observed that the prosecution tried Vandenburg for the sex crimes under the criminal responsibility theory, not as a principal actor. *Vandenburg*, 2019 WL 3720892, at *84. Thus, the issue of whether E.L. "consented to have sexual intercourse with [Vandenburg] shortly before the offenses" and had an "ongoing sexual relationship" with him "was not critical to his defense because it would not have rebutted any essential element" of him being the "ringleader or organizer of the offenses," as the prosecution theorized. *Id.* (internal quotation marks omitted); (ECF 1-1, Page ID# 41.)

On these facts, the TCCA reasonably applied federal law governing Vandenburg's right to present a defense when it affirmed the trial court's denial of his Rule 412 motion. Vandenburg had a right to present a defense, but it was limited and "subject to reasonable restrictions[,]" including "accomodat[ing] other legitimate interests in the criminal trial process." *Scheffer*, 523 U.S. at 307. Evidentiary exclusion violates the defense right if it "infringe[s] upon a weighty interest of the accused." *Id.*

For context, Tennessee Rule of Evidence 412 seeks to "strike[] a balance between the paramount interests of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy." Tenn. R. Evid. 412 Cmt. Rule 412 "specifically recognizes that, despite the embarrassing nature of the proof, sometimes the accused can only have a fair trial if permitted to introduce evidence of the alleged victim's sexual history." *Id.* But the rule also recognizes that the public's interest in prosecuting sexual offenders "is frustrated when sexual assault victims refuse … to testify about

43

[the offenses] at trial because of the possible admission of evidence of their sexual history" and "seeks to minimize the likelihood that evidence of the alleged victim's sexual history may cause the jury to be unfairly prejudiced against the victim." *Id.*

Here, evidence of E.L.'s "ongoing sexual relationship" with Vandenburg had no bearing on his defense that he did not organize her sexual assault by his teammates. Importantly, E.L. testified that she did not consent to sex with Vandenburg on the night of June 22, 2013. *Vandenburg*, 2019 WL 3720892, at *83. The TCCA further recognized that, even if E.L. properly consented, it could not be "expanded to apply when [she] was unconscious." *Id.*

On these facts and law, Vandenburg has not established that the TCCA's decision was "so lacking in justification," meaning an "extreme malfunction" occurred, to obtain habeas relief. *Donald*, 575 U.S. at 316; *Richter*, 562 U.S. at 103. Put simply, the state courts reasonably applied federal law when they ruled against Vandenburg because the proposed evidence of the "ongoing" relationship was irrelevant to his defense against being held criminally responsible for the sex crimes. *Compare Martin v. MacLaren*, No. 4:13-cv-13830, 2016 WL 2643292, at *7-8 (E.D. Mich. May 10, 2016) (defense right not violated where defendant "did not establish that [individual's] various past acts of striking [the victim] had any tendency to make his culpability in inflicting the fatal injuries more or less probable"). In so doing, the state courts reasonably decided to prevent Vandenburg from potentially unfairly prejudicing E.L. to the jury through this irrelevant evidence.

And importantly, the fact that a fairminded jurist may have decided this claim differently bars unreasonable-application relief. Indeed, the governing rules of law are rather "general," providing "more leeway" for courts to dispose of the claim. *Richter*, 562 U.S. at 101. Accordingly, Vandenburg cannot, and certainly has not, shown there was "no possibility fairminded jurists could

44

disagree" about the TCCA's application of the non-specific rules governing the right to present a defense. *Richter*, 562 U.S. at 101, 103. He is not entitled to relief under § 2254(d)(1).

Finally, Vandenburg's bare bones conclusory allegation that is devoid of any factual challenge warrants no habeas corpus relief under § 2254(d)(2). By not challenging the facts, just the law, the Court should deny his superficial factual challenge.

The Court should dismiss Ground Seven with prejudice.

### D. Vandenburg Procedurally Defaulted Ground Eight, Which Alleges that the Trial Court Prevented him From Presenting a Defense When it Denied Introduction of his Co-Defendants' Prior Bad Acts.

Vandenburg argues that the trial court deprived him of his right to present a defense when it denied introduction of evidence of his co-defendants' prior bad acts under Tenn. Code Ann. § 24-7-125. (ECF 1-1, Page ID# 42-43.) But this claim as pleaded is procedurally defaulted because Vandenburg did not exhaust the legal claim with this precise factual basis on direct appeal.

This Court lacks "jurisdiction to consider a claim in a habeas petition that was not fairly presented to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (internal quotation marks omitted) (quoting *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987)). Fair presentation of a claim requires the petitioner to press "both the factual and legal basis for his claim to the state courts." *Id.*; *see also Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court"). If a federal claim "rests on a theory which is separate and distinct from the one previously considered and rejected in state court[,]" *Wong*, 142 F.3d at 322, the claim is procedurally defaulted.

That occurred here, where Vandenburg argued the claim by citing different state-law theories, specifically Tennessee Rules of Evidence 402, 404(b), 608(b), and 616. (*See* ECF 19-2,

pp. 1-13.)  But nowhere did Vandenburg cite, much less argue, Tenn. Code Ann. § 24-7-125 to support his claim.  (*See generally* ECF 19-2, -4.)  Thus, he failed to properly exhaust this § 24-7-125 theory in state court at the appropriate time, and he now lacks has any ability to properly exhaust it in state court.  *See* Tenn. Code Ann. § 40-30-106(g) (relief ground "waived if the petitioner . . . failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented"); *see, e.g.*, *Brimmer v. State*, 29 S.W.3d 497, 529 (Tenn. Crim. App. 1998) (issues "waived because they were available at trial and on direct appeal but not pursued") (no perm. app. filed).  Thus, Vandenburg procedurally defaulted the presented claim.  28 U.S.C. § 2254(c); *Coleman*, 501 U.S. at 732.

Vandenburg does not acknowledge this procedural default; by invoking § 2254(d), he implies that the claim is properly before the Court.  (*See* ECF 1-1, Page ID# 42-43.)  Thus, he pleads neither cause and prejudice to excuse the default nor the applicability of the fundamental-miscarriage-of-justice exception.  *Coleman*, 501 U.S. at 750.  The Court need not address this claim further.

But even if he so pleaded, Vandenburg would be unable to establish any entitlement to excuse this procedural default.  A petitioner cannot satisfy the prejudice component where "there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim."  *Rust*, 17 F.3d at 161-62.  And establishing a "fundamental miscarriage of justice" warranting excusal of a default requires a petitioner to show his actual innocence, *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006), meaning "factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 623 (1998).  And Vandenburg can establish neither given the "overwhelming" evidence of his guilt as characterized by the TCCA during both direct and post-conviction appeal.

46

*Vandenburg*, 2024 WL 330525, at *10, *12; *Vandenburg*, 2019 WL 3720892, at *46, *56-57.  The

Court should dismiss this procedurally defaulted claim with prejudice.[6]

### III.   Vandenburg's Claims of Ineffective Assistance of Trial Counsel Provide No Relief Because the TCCA's Adjudications Withstand AEDPA Scrutiny.

Because Vandenburg bases his claims of ineffective assistance of counsel on his defense-

right allegations described above, Respondent will now address Grounds Nine through Eleven,

which allege three properly exhausted claims of ineffective trial counsel.  (ECF 1-1, Page ID# 43-

52.)  He asserts that Counsel provided ineffective assistance when he failed (1) to present Dr.

Alexander's proposed testimony as that of a psychiatric expert rather than an intoxication expert;

(2) to properly move for and introduce his co-defendant's prior bad acts; and (3) to introduce

Vandenburg's voicemails that he left for Mr. Quinzio during the sexual assault.  (ECF 1-1, Page

ID# 43-52.)

*Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective-counsel claims.  Under

*Strickland*, the petitioner must establish that trial counsel's performance was objectively deficient

and that the petitioner suffered prejudice due to counsel's deficient performance.   *Id*. at 687.   If

the petitioner fails to satisfy one of these showings, the claim fails, and the court need not continue

its analysis.  *Id*.

---

[6] As explained below, the TCCA denied a claim of ineffective assistance of counsel for "failing to argue for the admission of this evidence under Tennessee Code Annotated section 24-7-125[,]" opining that this "irrelevant" evidence "would have been inadmissible whether counsel had argued under Rule 404(b) or Code section 24-7-125."   *Vandenburg*, 2024 WL 330525, at *11-12. Moreover, although Vandenburg did not cite § 24-7-125 in support of the defense-right claim on direct appeal, the TCCA nevertheless held that his right was not violated when the trial court excluded this evidence based upon the evidentiary rules Vandenburg did cite.  *Vandenburg*, 2019 WL 3720892, at *80.  These facts certainly point to "a lack of evidence to support his claim."  *Rust*, 17 F.3d at 161-62.

To establish deficient performance, the petitioner must prove that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. When reviewing trial counsel's performance, a court must make "every effort" to eliminate "the distorting effects of hindsight" and "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690.

To prove prejudice, the petitioner must demonstrate that, but for counsel's deficient performance, a reasonable probability of a different outcome would have resulted. *Id*. at 693-94. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

While a court's evaluation of trial counsel's assistance is "highly deferential" under *Strickland*, 466 U.S. at 689, on habeas review, the petitioner must overcome a doubly deferential standard in favor of the state-court judgment. *Richter*, 562 U.S. at 101. First, the petitioner must overcome § 2254(d)'s highly deferential standard that the state court reasonably applied *Strickland*. *Id*. Second, the petitioner must show that there is no reasonable argument that trial counsel's performance fell within the wide range of reasonable professional assistance. *Id*.

Importantly, Vandenburg again pleads these claims in "error correction" terms, *Hale*, 122 F.4th at 645, not in AEDPA terms. *Hank*, 2014 WL 4626456, at *3. Therefore, the Court may dismiss them without further analysis on this basis alone. *See id*. Nevertheless, Vandenburg fails to satisfy the doubly-deferential standard of review on his ineffective-counsel claims.

### A. The Ineffective-Counsel Claim Regarding Dr. Alexander's Expert Testimony Provides No Relief Because Vandenburg Failed to Show the TCCA's Decision Contradicted, or Involved an Unreasonable Application of, *Strickland*, or that the Decision Rested on An Unreasonable Determination of the Facts.

Vandenburg claims that Counsel "should have properly presented Dr. Alexander's purposed [sic] testimony as an expert in the field of psychiatry in relation to intoxication not as an

48

intoxication expert[.]" (ECF 1-1, Page ID# 43-46.) Vandenburg argues that, if Counsel had argued this distinction, the trial court would have permitted Dr. Alexander to testify for the defense, leading to a reasonable probability of a different trial outcome. (ECF 1-1, Page ID# 43-46.)

The TCCA affirmed the trial court's denial of post-conviction relief on this claim based on *Strickland*'s prejudice prong as follows:

> The Petitioner argues that the post-conviction court erred by finding that Dr. Alexander had the opportunity to testify about the effects of intoxication on the Petitioner's ability to form intent. The Petitioner argues that lead counsel failed to elicit such testimony from Dr. Alexander during the pretrial hearing in order to have Dr. Alexander qualified as an expert psychiatrist.
>
> The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007) (citing *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005)). Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702.
>
> The Petitioner argues that lead counsel's performance was deficient. However, even if lead counsel's performance was deficient by his not asking appropriate questions, the Petitioner has failed to show how he was prejudiced. The record shows that Dr. Alexander had an opportunity to testify at the pretrial June 2016 hearing. The post-conviction court noted that the trial court determined that Dr. Alexander was not qualified as an expert, finding that Dr. Alexander would not have been qualified as an expert to testify about the effects of the Petitioner's intoxication level on his ability to form intent and finding that Dr. Alexander's testimony lacked trustworthiness. *See* Tenn. R. Evid. 703; *see also McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997) ("A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.")
>
> We also note that Dr. Alexander was psychiatrist and not a toxicologist. *See Vandenburg*, 2019 WL 3720892, at *31. At the pretrial June hearing, Dr. Alexander testified that, after medical school, he had received no training in toxicology and that he did not normally prepare reports similar to the one he had prepared for the Petitioner. *Id*. at *30. Dr. Alexander said that he based his report on an email

questionnaire containing the Petitioner's answers and that he did not interview the Petitioner. *Id*. At the post-conviction hearing, Dr. Alexander testified that he was not certified in toxicology. Dr. Alexander said that he interviewed the Petitioner but admitted that the interview did not happen until after he had prepared his report. The Petitioner has failed to show that Dr. Alexander would have been qualified to testify about the effects of alcohol on the Petitioner's ability to form the requisite intent.

Dr. Alexander's testimony at both the pretrial hearing and the post-conviction hearing show that he was not a toxicologist and completed his report without first speaking to the Petitioner. In addition to not speaking with the Petitioner prior to writing his report, the proof from the pretrial hearing also demonstrates that Dr. Alexander did not review the surveillance footage of the Petitioner prior to such time. *Id*. at *31. Further, Dr. Alexander did not have enough information to determine whether the Petitioner was malingering. *Id*. In previously concluding that Dr. Alexander's proposed testimony lacked indicia of reliability, this court noted that "Dr. Alexander relied on self-serving and uncorroborated statements from [the Petitioner] to calculate [the Petitioner's] approximate BAC during the offenses." *Id*. at 33. With these considerations in view, the post-conviction court correctly found that Dr. Alexander's testimony was unreliable and would not have been admitted at the Petitioner's trial. This would be the case even if lead counsel had tendered Dr. Alexander in a different manner at the pretrial hearing, thus defeating a showing of prejudice under the *Strickland* standard.

Moreover, at the post-conviction hearing, Dr. Alexander testified that it would have been difficult for the Petitioner to form the requisite intent. *See State v. Hall*, 958 S.W.2d 679, 690 (Tenn. 1997) (holding a "lack of capacity to form the requisite culpable mental intent ... is central to evaluating the admissibility of expert psychiatric testimony on [an] issue"). At the post-conviction hearing, Dr. Alexander did not testify that the Petitioner lacked the capacity to form the requisite intent. As such, Dr. Alexander's testimony, as proffered at the post-conviction hearing, would have been inadmissible at trial under the *Hall* standard. *See State v. Merritt*, No. E2011-01348-CCA-R3-CD, 2013 WL 1189092, at *27 (Tenn. Crim. App. Mar. 22, 2013) (holding that the trial court did not abuse its discretion in excluding evidence that the defendant's mental disease or defect impaired or reduced his ability to form the required mens rea, rather than stating that the defendant "completely lacked the capacity to commit premeditated first degree murder"); *State v. Austin*, No. W2005-01963-CCA-R3-CD, 2007 WL 2624399, at *6 (Tenn. Crim. App. Sept. 10, 2007) (holding that although the trial court erred in ruling that an expert witness could not testify about the ultimate issue of the defendant's mental state, the error was harmless because testimony that the defendant's mental disease merely "impacted" his capacity to form the required mental state was inadmissible under Hall); *State v. Idellfonso-Diaz*, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207, at *4 (Tenn. Crim. App. Nov. 1, 2006) ("The fact that the [defendant's] mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy

50

the two-prong requirement in *Hall* and [*State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005)].").

In any event, as conceded by the Petitioner at the post-conviction hearing, the trial record is replete with proof of the Petitioner's intoxication at the time of the offenses. As noted by co-counsel at the post-conviction hearing, lead counsel successfully obtained an intoxication jury instruction. This court previously noted on direct appeal that the proof of the Petitioner's guilt was "overwhelming." *Vandenburg*, 2019 WL 3720892, at *46. For the foregoing reasons, we conclude that the Petitioner was not prejudiced by any alleged deficiency of lead counsel related to the admission of Dr. Alexander's testimony.

*Vandenburg*, 2024 WL 330525, at *9-10.

By pleading his claim in error-correction terms, Vandenburg does not show how the above adjudication contradicted *Strickland*'s prejudice prong. The TCCA correctly cited and applied *Strickland*, the governing clearly established federal law, to the accredited facts. *See generally Vandenburg*, 2024 WL 330525, at *8-10. Thus, the adjudication is "run-of-the-mill" and does not "fit comfortably" as a contrary-to challenge. *Williams*, 529 U.S. at 406.

Moreover, the error-correction argument does not prove how the TCCA unreasonably applied *Strickland*'s prejudice prong. Construing Vandenburg's argument as one under the unreasonable-application clause, he claims that, if Counsel had "solicited the proper testimony to ensure that Dr. Alexander was deemed qualified as" a psychiatric expert, Alexander would have then been able to testify about "his mental capacity to form the intent on the night of the incident in light of his severe intoxication[.]" (ECF 1-1, Page ID# 44-46.) So, Vandenburg believes that, if Counsel had performed in the manner Vandenburg asserts, Dr. Alexander would have been admitted as a psychiatric expert and then could have testified about Vandenburg's intoxication. (*See id*.)

But Vandenburg again fails to appreciate several facts that would prevent Dr. Alexander from testifying which the TCCA noted. First, while Dr. Alexander was a psychiatrist, he lacked

any general or specific-to-this-case expertise in toxicology and had never been qualified as a toxicology expert. *Vandenburg*, 2024 WL 330525, at \*9-10; (ECF 17-12, Page ID# 7512.) Second and more importantly, besides his lack of toxicology expertise, Dr. Alexander notably formed his proposed testimony upon "self-serving and uncorroborated statements from" Vandenburg without even speaking to him or "review[ing] the surveillance footage." *Id.* at \*10.

Additionally, the TCCA opined that Vandenburg established no prejudice for three other reasons. First, Dr. Alexander never testified that Vandenburg could not form the requisite criminal intent, but rather "that it would have been *difficult*" for him to form intent. *Id.* (emphasis in original); (ECF 17-12, Page ID# 7508-09.) So, even if Dr. Alexander had toxicology expertise and properly examined Vandenburg, his testimony still was inadmissible under state precedent. *Vandenburg*, 2024 WL 330525, at \*10 (collecting cases). Second, Vandenburg still evidenced "proof of [his] intoxication" without Dr. Alexander's testimony, which led to the trial court instructing the jury on "intoxication." *Id.*; (*see* ECF 16-11, Page ID# 1306-07; ECF 16-50, Page ID# 6383-84.) Third and finally, the proof of Vandenburg's guilt was "overwhelming[,]" and thus, he could not establish *Strickland* prejudice regardless of Counsel's performance. *Vandenburg*, 2024 WL 330525, at \*10.

"Prejudice" is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Vandenburg*, 2024 WL 330525, at \*9 (citing *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006); *Strickland*, 466 U.S. at 694)). And on habeas review, Vandenburg must show not only prejudice but also that the TCCA's prejudice application was "so lacking in justification" to warrant relief. *Donald*, 575 U.S. at 316. He has not met this standard based on the facts of the case outlined above. Indeed, putting Dr. Alexander's exclusion aside, the fact that information concerning Vandenburg's intoxication pervaded the record and

garnered a jury instruction provides enough justification to defeat the unreasonable-application challenge. And the "overwhelming" evidence of his guilt certainly justified the TCCA's prejudice application. *See Strickland*, 466 U.S. at 695-96 (verdict supported by "overwhelming record support" prevents prejudice showing); *Crawley v. Curtis*, 151 F. Supp. 2d 878, 885 (E.D. Mich. 2001) ("evidence at trial was overwhelming and [] the failure to suppress Petitioner's statement would not have changed the outcome of the case").

Finally, Dr. Alexander clearly conceded that he lacked any expert knowledge in intoxication matters plus any first-hand knowledge of Vandenburg's intoxication during the assault. He also could not opine that Vandenburg could not form intent, only that it would have been difficult to form it. (ECF 17-12, Page ID# 7508-09.) On this record, there clearly were multiple reasons justifying the state court's prejudice application. *Richter*, 562 U.S. at 102; *Donald*, 575 U.S. at 316. Vandenburg is entitled to no relief under § 2254(d)(1).

§ 2254(d)(2) also provides him no relief. Vandenburg largely ignores most, if not all, of the key facts underlying the state-court decision. The easiest example is his ignoring the fact that the TCCA based its prejudice decision on the amount of evidence of his intoxication that was introduced during trial. (ECF 1-1, Page ID# 43-46.) And he certainly presented no evidence that rebuts the TCCA's observation of the overwhelming evidence of his guilt. (ECF 1-1, Page ID# 43-46.) Because Vandenburg does not, and could not, rebut these facts upon which the TCCA based its decision, the Court cannot grant him relief under § 2254(d)(2).

The Court should dismiss Ground Nine with prejudice.

**B. Ground Ten Provides No Relief Because the TCCA's Analysis Did Not Contradict, or Unreasonably Apply, *Strickland*'s Prejudice Prong, and was Not Based on an Unreasonable Determination of the Facts Established in State Court.**

Vandenburg's second ineffective-counsel claim alleges that Counsel was ineffective by not litigating "the admission of co-defendants [sic] prior bad acts evidence by utilizing T.C.A. § 24-7-125 rather than T.R.Cr. P. Rule 404(b) and 608 to show the co-defendants [sic] motive and intent to minimize Vandenburg's role in their crimes[.]" (ECF 1-1, Page ID# 46-48.) Vandenburg also accuses Counsel of ineffectiveness by not "argu[ing] the admissibility of this evidence under Due process principles." (ECF 1-1, Page ID# 47-48.)

The TCCA affirmed the trial court's denial of post-conviction relief on this claim during the post-conviction appeal as follows:

> The Petitioner argues that he received the ineffective assistance of trial counsel by lead counsel's failure to litigate the Petitioner's motion to admit prior bad acts of his codefendants pursuant to Tennessee Code Annotated section 24-7-125. The Petitioner argues that counsel should have utilized this code section, rather than Tennessee Rules of Evidence 404(b) and 608, to show the codefendants' motive and intent in order to minimize the Petitioner's role. The Petitioner argues that because codefendants Batey, Banks, and McKenzie were not tried jointly with the Petitioner, they could not have been prejudiced by the probative value of this evidence. He argues that lead counsel should have raised this issue and argued that analysis of the probative value alone was the proper consideration. The State counters that this evidence was irrelevant and that the Petitioner is merely restyling an unsuccessful argument raised on direct appeal as an ineffective assistance claim.

> "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In general, relevant evidence is admissible, and irrelevant evidence is inadmissible. Tenn. R. Evid. 402. The court may, however, exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

> Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible. Our supreme court has determined that Rule 404(b) applies only to the accused. *See State v. Stevens*, 78 S.W.3d 817,

54

837 (Tenn. 2002). In 2014, however, the General Assembly enacted Tennessee Code Annotated section 24-7-125, the language of which is "essentially identical" to Rule 404(b) except that it applies to "any individual, including a deceased victim, the defendant, a witness, or any other third party[.]" *See State v. Moon*, 644 S.W.3d 72, 82 (Tenn. 2022) (noting that section 24-7-125 "expanded Rule 404(b)'s protections to all witnesses in a criminal case").

Section 24-7-125 provides that in a criminal case, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual, including a deceased victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." The conditions that must be satisfied before the evidence is admitted are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. Code Ann. § 24-7-125.

Even if lead counsel was deficient by failing to argue for the admission of this evidence under Tennessee Code Annotated section 24-7-125, the Petitioner has failed to establish prejudice. Evidence that the Petitioner's codefendants did not need the Petitioner's encouragement or assistance to commit the offenses is not relevant to the Petitioner's criminal responsibility. See Tenn. Code Ann. § 39-11-402(2) (stating that a person is criminally responsible for an offense committed by another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense"). Importantly, as noted by the post-conviction court, a panel of this court found that the evidence was irrelevant. *Vandenburg*, 2019 WL 3720892, at *80; *see State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000) (holding that pursuant to the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal). Because the evidence was irrelevant, it would have been inadmissible whether counsel had argued under Rule 404(b) or Code section 24-7-125. The Petitioner has failed to show prejudice. Accordingly, he is not entitled to relief regarding this issue.

55

Also, regarding this bad act evidence, the Petitioner argues that the trial court violated his due process rights by limiting his right to present a defense and that lead counsel should have argued for admission under due process principles pursuant to both the Tennessee and United States Constitutions. However, this matter has already been decided on direct appeal from the Petitioner's convictions. *See Vandenburg*, 2019 WL 3720892, at *80 (determining that the Petitioner's "right to present a defense was not violated by the trial court's exclusion of the evidence" pertaining to the codefendants' prior bad acts). Post-conviction relief is not available for claims that have been previously determined. See Tenn. Code Ann. § 40-30-106(f). Furthermore, "[a] ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing[,]" and "[a] full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." *Id.* at § 40-30-106(h). The Petitioner's "right to a defense" claim on this issue was previously determined on direct appeal. The Petitioner is not entitled to post-conviction review of this same issue.

*Vandenburg*, 2024 WL 330525, at *10-12.

Before addressing the merits, Respondent must point out that the TCCA did not specifically address Vandenburg's claim that Counsel provided ineffective assistance by not seeking introduction of the bad-act evidence under a due process theory. *See id.* at *12. The TCCA instead addressed the argument as a standalone due-process claim that Vandenburg previously presented on direct appeal. *Id.* But this is inconsequential.

A state court need not "give reasons before its decision can be deemed to have been adjudicated on the merits." *Richter*, 562 U.S. at 100 (internal quotation marks omitted). Notably, the Supreme Court has observed that "litigants, not judges, know their cases best." *Rogers v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (citing *Johnson v. Williams*, 568 U.S. 289, 306 (2013)). "If a habeas petitioner believes a state court overlooked his claim, he should move for reconsideration on those grounds. Otherwise, federal courts should treat it as adjudicated." *Id.* Here, Vandenburg presented this ineffective-counsel issue to the TCCA on post-conviction appeal, and the TCCA denied the due-process argument based on its previous determination. *Vandenburg*, 2024 WL

56

330525, at *12. But Vandenburg chose to not "move for reconsideration" of the issue or press it in his application for permission to appeal filed in the Tennessee Supreme Court. (*See generally* ECF 17-20.); *compare Rogers*, 69 F.4th at 389. So, the Court should treat this ineffective-counsel claim as adjudicated on the merits since Vandenburg "concede[d] that the state court adjudicated this claim[,]" although he now argues the TCCA "side step[ped his] constitutional due process" issue. *Id*. at 388-89; (ECF 1-1, Page ID# 48.)

Plus, one can assume the TCCA denied the ineffective-counsel claim based on its previous resolution of the direct appeal due-process claim. *Vandenburg*, 2024 WL 330525, at *12; *see Vandenburg*, 2019 WL 3720892, at *80. Since that standalone claim failed, so too went the ineffectiveness claim.

Turning to § 2254(d)(1), Vandenburg has not shown, and cannot show, that the above decision contradicts *Strickland*. The TCCA correctly cited *Strickland* as the controlling federal precedent and applied it to facts of the case, rendering its decision "run-of-the-mill" and not contrary to *Strickland*'s prejudice prong. *Williams*, 529 U.S. at 406.

Vandenburg also cannot show that the adjudication involved an unreasonable application of *Strickland*'s prejudice prong. § 2254(d)(1). Regarding Tenn. Code Ann. § 24-7-125, the TCCA decided that the proffered bad-act evidence concerning the co-defendants was irrelevant to Vandenburg's defense against criminal responsibility for the crimes. *Vandenburg*, 2024 WL 330525, at *11. Because of this irrelevance, the TCCA reasonably applied *Strickland* when it held that Counsel's performance in not requesting introduction of the bad-act evidence under § 24-7-125 led to no prejudice. *Id*.

And Vandenburg has not argued how this decision unreasonably applied the prejudice prong; he mistakenly claims that the "TCCA side step[ped] T.C.A. § 24-7-125 and how it would

apply to [his] argument." (ECF 1-1, Page ID# 48.) But as shown above, the TCCA quoted the statute and decided that the at-issue evidence "would have been inadmissible" regardless of Counsel's arguments. *Vandenburg*, 2024 WL 330525, at *10-11. This incorrect assertion certainly establishes no unreasonable application of the prejudice prong.

As for the due-process argument, the TCCA held that it previously determined the argument lacked merit, implying that Counsel's performance in not raising the argument caused Vandenburg no prejudice. *See id*. at *12. Vandenburg observes the TCCA did not explicitly address the ineffective-counsel claim but provides no further analysis beyond essentially arguing that the TCCA erred. (ECF 1-1, Page ID# 48.) That is insufficient for the Court to grant him relief.

And nevertheless, Vandenburg is still unentitled to relief even if the Court agrees with him that the TCCA overlooked this ineffective-counsel claim and conducts a de novo review. Prejudice is shown where a petitioner establishes that, but for counsel's performance, there was a "reasonable probability" of a different trial outcome. *Strickland*, 466 U.S. at 694. The TCCA denied any due process violation by concluding that the at-issue evidence "did not establish that any of the co-defendants had sex with Jane Doe, that Jane Doe was raped while on Vanderbilt's campus, or that Jane Doe was unconscious while on Vanderbilt's campus." *Vandenburg*, 2019 WL 3720892, at *80. Thus, this evidence bore no relevance "to the issues raised" at Vandenburg's trial, meaning it "was not critical to [his] theory of the case." *Id*. Because the previously-determined due process claim was meritless, Vandenburg cannot establish prejudice under *Strickland* since the issue would not have changed the outcome of his trial had Counsel raised it. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."). In sum, Vandenburg is unentitled to habeas corpus relief based on the state court's legal conclusions.

58

Finally, Vandenburg does not directly challenge the facts upon which the TCCA based its decision denying this ineffective-counsel claim. (ECF 1-1, Page ID# 46-48.) He instead challenges the TCCA's legal holdings without attempting to rebut the factual determinations by clear and convincing evidence. § 2254(e)(1). He is unentitled to relief under § 2254(d)(2), and the Court should dismiss Ground Ten with prejudice.

### C. Ground Eleven, which Alleges that Counsel Performed Ineffectively by Not Properly Arguing for a Voicemail's Admission, Provides No Relief Because the TCCA's Adjudication Withstands AEDPA Scrutiny.

Vandenburg asserts that Counsel was ineffective by not "advanc[ing] the proper/right argument regarding the introduction of the voicemail to Joseph Quinzin [sic] on the night of the incident." (ECF 1-1, Page ID# 49-52.) He contends that Counsel should have countered the prosecution's argument that the voicemail was "self-serving" by characterizing it as "disserving" and that "the statement was non-hearsay as it was not raised to prove the truth of the matter asserted[.]" (ECF 1-1, Page ID# 49.)

The TCCA addressed these arguments during post-conviction appeal as follows:

> The Petitioner argues that he received the ineffective assistance of trial counsel by lead counsel's failure to argue that his voicemail to Mr. Quinzio should have been admitted as a "disserving" rather than self-serving statement. The Petitioner also argues that lead counsel should have argued that the statements in the voicemail were non-hearsay, in that they were not offered for the truth of the matter asserted. The Petitioner asserts that had counsel made this argument, the evidence likely would have been admitted.

> The Petitioner's claim must fail because lead counsel in fact advanced the same arguments at trial that the Petitioner now proposes on post-conviction. At trial, lead counsel argued that the voicemail was not self-serving in that it was "actually an admission that [the Petitioner] was present." *See Vandenburg*, 2019 WL 3720892, at *44. Lead counsel argued that the purpose of admitting the voicemail was to demonstrate that the Petitioner was "very intoxicated" and to form "a foundation for Mr. Quinzio's opinion that [the Petitioner] was drunk[,]" both non-hearsay justifications for the admission of the voicemail recording. *Id*. While lead counsel's arguments were unsuccessful in the trial court, this court later accepted the arguments advanced by lead counsel, holding that "the trial court erred in excluding

59

the voicemail as hearsay because the statements in the voicemail were not offered for the truth of the matter asserted." *Id*. at \*46. The record shows that lead counsel did not act deficiently on this issue.

Even if lead counsel had performed deficiently, the Petitioner is unable to demonstrate prejudice. Despite ruling that the trial court erred in excluding the voicemail recording, this court held on direct appeal that, based on the "overwhelming evidence" of the Petitioner's guilt, "the exclusion of the voicemail was harmless error." *Id*. We agree with this assessment as it relates to the prejudice prong of Strickland. As noted, there was a plethora of evidence at trial indicating the Petitioner's high level of intoxication during the offenses. The admission of this voicemail recording would have done little to advance what was already an obvious fact. On the other hand, the admission of the Petitioner's statements in the voicemail would have likely prejudiced him in front of the jury. The voicemail places the Petitioner at the scene of the offenses when they occurred. Most damning, the voicemail contains the Petitioner's admission that one of his codefendants was "pissing on her p---y" and the Petitioner's acknowledgment that he was in "deep s---." *Id*. The Petitioner is not entitled to relief.

*Vandenburg*, 2024 WL 330525, at \*12.

As shown, the TCCA resolved this claim under both *Strickland* prongs. Under the contrary-to clause, Vandenburg must show that the TCCA's adjudication was "diametrically different" than *Strickland*, which he has not. *Williams*, 529 U.S. at 405. He again argues the claim in error-correction terms, which does not show how the adjudication contradicted *Strickland*. (ECF 1-1, Page ID# 49-52.) So, Vandenburg is unentitled to relief under this clause.

For the same reason, the Court also should not grant Vandenburg relief under the unreasonable-application clause. He merely claims the TCCA's adjudication is "misplaced" and that "[i]t is apparent that the TCCA did not review these issues in the context of ineffective assistance of counsel." (ECF 1-1, Page ID# 51.) But this assertion is plainly incorrect and certainly fails to show that the TCCA's adjudication was "so lacking in justification" to warrant relief under the unreasonable-application clause. *Donald*, 575 U.S. at 316.

Contrary to these baseless assertions, the TCCA plainly applied *Strickland*'s prongs in affirming the trial court's relief denial. Notably, the TCCA reasonably applied the prejudice prong

when it noted that the "overwhelming" evidence of Vandenburg's guilt prevented him from establishing prejudice. *Vandenburg*, 2024 WL 330525, at *12 (quoting *Vandenburg*, 2019 WL 3720892, at *46). This determination reflects a reasonable and, in fact, a correct application of the prejudice prong because "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. A guilty verdict with "overwhelming record support" is less "likely to have been affected by errors," assuming any. *Id*. at 696. Based on this plain language, the overwhelming evidence of Vandenburg's guilt sufficiently justified the prejudice prong application. *Donald*, 575 U.S. at 316; *compare Crawley*, 151 F. Supp. 2d at 885 ("overwhelming" trial evidence prevented prejudice showing through "failure to suppress [his] statement").

While the claim could have failed on prejudice alone, *Strickland*, 466 U.S. at 692, the TCCA still applied the performance prong and concluded that Counsel adequately performed because he "advanced the same arguments at trial" that Vandenburg now accuses him of not advancing. *Vandenburg*, 2024 WL 330525, at *12. Notably, the TCCA on direct appeal determined that the trial court committed harmless error by not admitting the voicemail statements under relevant hearsay rules, just as Counsel argued. *Id*. (citing *Vandenburg*, 2019 WL 3720892, at *46). So, it is unclear what more Counsel could have done on this issue, which did not harm the trial as the TCCA opined.

Moreover, the voicemail, which Vandenburg claims would evince his intoxication during the sexual assault, was nothing more than cumulative evidence of this point if introduced. Indeed, the TCCA noted the extensive evidence of Vandenburg's intoxication present in the record. *Vandenburg*, 2019 WL 3720892, at *46. "Counsel cannot be considered ineffective for failing" to successfully move for introduction of this "merely cumulative" voicemail. *Compare United States*

61

*v. Alqsous*, No. 1:16-cr-329-2, 2025 WL 896095, at *8 (N.D. Ohio Mar. 24, 2025). Considering these points, the TCCA did not unreasonably apply the performance prong either.

Finally, Vandenburg takes no aim at the state courts' factual determinations beyond a conclusory allegation contending that they entitle him to relief under § 2254(d)(2). But even if he did, one fact upon which the TCCA based its adjudication bars this relief—the "overwhelming" evidence of his guilt. *Vandenburg*, 2024 WL 330525, at *12. Given the totality of incriminating evidence, Vandenburg cannot show that the TCCA based its decision on an unreasonable determination of the established facts. The Court need only read the direct appeal summary of the evidence to determine that this fact is more than sustained. Vandenburg is unentitled to relief based upon the factual determinations.

The Court should dismiss Ground Eleven with prejudice.

## IV. Ground Three, which Alleges that the Trial Court Erred by Denying Vandenburg's Suppression Motion, Provides No Relief Because the TCCA Did Not Base its Holding on an Unreasonable Determination of the Established Facts that Underlay its Reasonable Application of Clearly Established Federal Law.

Vandenburg argues that the state courts wrongly decided that his constitutional right against self-incrimination[7] was not "violated by an unlawful interrogation without informing him of his *Miranda* rights." (ECF 1-1, Page ID# 26-32.) Vandenburg bases his allegation entirely upon his version of the interrogation and claims that, due to this unconstitutional interview, the evidence

---

[7] Vandenburg also pursues this claim under the protection afforded by Article I, § 9 of the Tennessee Constitution. (ECF 1-1, Page ID# 26, 31-32.) But this reliance is not cognizable on federal habeas review because it alleges no violation of the federal "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Armstrong v. State*, No. 1:15-cv-103, 2016 WL 465458, at *9 (M.D. Tenn. Feb. 8, 2016). Moreover, Vandenburg states in Ground Three's heading that he alleges the claim under the Fourth Amendment, but this appears to be a typographical error given his Fifth Amendment argument. (ECF 1-1, Page ID# 26.)

62

gathered from the detectives' accessing his cell phone, the access request being made during the interview, constituted "fruit of the poisonous tree." (ECF 1-1, Page ID# 26-32.)

The TCCA affirmed the trial court's denial of Vandenburg's suppression motion during his direct appeal as follows:

> Defendant argues that the MNPD performed an unlawful interrogation when they interviewed him at VPD headquarters without informing him of his *Miranda* rights or giving him access to an attorney. He asserts that, based on the totality of the circumstances, he was in police custody during the interview, and the MNPD officers lacked probable cause to detain him. Defendant contends that Mr. Colon and two VPD officers verbally coerced him to participate in the interview, and MNPD officers were armed and blocked the door during the interview, factors which created a custodial environment. Defendant further argues that "the initial possession and inspection of [Defendant]'s cell phone and the subsequent issuance of a search warrant for the same were derived directly from the involuntary statement given by [Defendant] and were each therefore inadmissible." The State contends in response that the trial court properly denied Defendant's motion to suppress because Defendant was not in custody when he gave his statement and because Defendant voluntarily gave a statement to Detective Mayo.
>
> On September 15, 2014, Defendant filed a motion to suppress "any and all items collected by police pursuant to or under color of search warrants issued by the General Sessions Court of Davidson County and executed on June 28, 2013 and/or thereafter and items subsequently collected pursuant to search warrants issued by California courts." He argued that "all the search warrants issued in this matter subsequent to June 27, 2013[,] are the direct or indirect fruits of an unlawful investigative detention without probable cause and/or coerced statement elicited from [Defendant] by police at the [VPD] Headquarters on June 27, 2013."
>
> On October 8, 2014, the trial court held a hearing on Defendant's motion to suppress. Gerald Leroy Black testified that he worked as the Assistant Dean of Students and the Director of the Office of Student Accountability, Community Standards, and Academic Integrity at Vanderbilt University in June 2013. Mr. Black explained that his office "review[ed], investigate[d], and resolve[d] incidents of misconduct that violate[d] [Vanderbilt's] policies and standards." On June 25, 2013, Mr. Black interviewed Defendant "[t]o determine whether any university policies or community standards had been violated[.]" He explained that the Vanderbilt Department of Athletics arranged for Defendant to meet with Mr. Black in the Zerfoss Student Health Center on the Vanderbilt campus. Mr. Black testified that he had no contact with the MNPD prior to the interview. He also stated that he did not know whether a criminal act had been committed when he interviewed Defendant.

On cross-examination, Mr. Black stated that he received an email on the evening of June 25 from a VPD officer and that he met with the officer on June 26. Additionally, he gave Defendant's statement to VPD on June 26. Mr. Black agreed that some VPD officers are armed, wear uniforms, and drive patrol cars. He explained that the Office of Student Accountability, Community Standards, and Academic Integrity has the authority to expel students who are "charged with and found responsible for violations of university policy." Mr. Black stated that, prior to beginning the interview with Defendant, he informed Defendant that no charges had been brought and that the interview was for a preliminary inquiry.

James Franklin, who worked as the head coach of the Vanderbilt Football Team in 2013, testified that he learned about the offenses while he was on vacation in June 2013. Mr. Franklin informed the football team that "there was a problem." He stated that Defendant and Co-defendants Batey, Banks, and McKenzie came to his office, but he informed them that he could not discuss the case with them. He explained that Defendant was suspended from the football team at the time Defendant came to his office, and Defendant was later dismissed from the team.

Defendant testified that, in 2013, he attended Vanderbilt University on a football scholarship. On the evening of June 25, 2013, Defendant met with Mr. Franklin after Mr. Franklin addressed the football team about the offenses involving E.L. Mr. Franklin met with Defendant individually in his office with the door closed and informed Defendant that he "needed to cooperate with police, answer every one of their questions, or [he] would lose [his] scholarship." On the evening of June 26, 2013, Defendant received a phone call from Kevin Colon, the Associate Director of Athletics at Vanderbilt University. Mr. Colon stated that Defendant "must meet with him the next morning at seven a.m. to talk with the police; and, that if [Defendant] did not meet with him[,] [Defendant] could lose [his] scholarship." On the morning of June 27, Defendant met with Mr. Colon at the Athletic Department building on the Vanderbilt University campus, and Mr. Colon again informed Defendant that he could lose his scholarship if he did not speak with the police. Mr. Colon told Defendant that he had been in constant contact with the police. While Mr. Colon escorted Defendant to the VPD headquarters, he said that Defendant could return to the football team if he answered all of the VPD's questions.

Once they arrived at the VPD headquarters, Mr. Colon left Defendant with a VPD sergeant. The sergeant escorted Defendant through a large room with armed, uniformed police officers. Defendant stated that he felt intimidated by the uniformed, armed officers. The sergeant took Defendant to a smaller room and closed the door, leaving Defendant alone. Later, two armed, uniformed police officers entered the small room and informed Defendant that he needed to speak to two men; the officers told Defendant that he had to answer all the questions asked of him before he could leave and that his scholarship was at risk. Defendant stated that he felt "uncomfortable" and "confined" by the officers' statements regarding his scholarship. Defendant testified that the VPD officers sat between Defendant

64

and the door of the small room; their body language was "intimidating[,]" "authoritative," and "somewhat aggressive[,]" which scared Defendant.

Defendant walked back through the room with the large group of armed, uniformed VPD officers and met with Detective Mayo and Sergeant Shreeve in another small room. The detectives sat between Defendant and the door to the small room; the detectives were armed, and their police badges were visible on their street clothing. Defendant testified that the detectives' tone of voice was nice, but their body language during the interview was aggressive. He explained that the detectives would move in front of the door or rest their hand on their gun. Detective Mayo informed Defendant that the door was unlocked, that Defendant could decline to answer their questions and leave at any time, and that he was not under arrest. However, Defendant observed that the door appeared to be locked when Detective Mayo attempted to leave to use the restroom during the interview. Neither Detective Mayo nor Sergeant Shreeve informed Defendant of his *Miranda* rights. When Defendant asked about an attorney during the interview, the detectives informed him that they would let him know if he needed one. Defendant did not feel like he could leave the interview.

During the interview, the detectives informed Defendant that they needed his cell phone. Defendant consented to retrieve his phone from his dorm room because he believed that he would lose his scholarship if he did not comply. Detective Mayo and a VPD officer drove Defendant back to his dorm room. The VPD officer accompanied Defendant into Gillette Hall and took possession of Defendant's phone. When Defendant and the VPD officer returned to the vehicle, the officer gave Defendant's phone to Detective Mayo, who accessed the files and data on the phone. Once Defendant, Detective Mayo, and the VPD officer returned to the VPD headquarters, Detective Mayo and Detective Shreeve continued their interview with Defendant. Additionally, the detectives asked for Defendant's consent to search the contents of his phone and for a saliva sample. Defendant stated that he spent approximately five hours at the VPD station, including the trip to retrieve his phone. During this time, he felt like he could not leave the VPD headquarters or decline to answer questions because if he did, he would lose his scholarship.

On cross-examination, Defendant estimated that there were at least twenty police officers in the VPD headquarters. Defendant agreed that he consented to allow Detective Mayo and Sergeant Shreeve to examine the contents of his cell phone, but he asserted that he consented against his will. Defendant also agreed that he gave Detective Mayo the password to unlock his phone during the interview. Defendant agreed that he was never physically restrained with handcuffs.

Sergeant Shreeve testified that he supervised the sex crimes unit at the MNPD. Sergeant Shreeve assisted Detective Mayo with the interview of Defendant on June 27, 2013, at the VPD headquarters. Sergeant Shreeve explained that the investigation into the offenses against E.L. was in an early stage on June 27 because the MNPD first learned of the surveillance video showing E.L. unconscious on the

65

floor of Gillette Hall on June 26 when Major Greg Robinson of the VPD called Sergeant Shreeve. After viewing the surveillance video, the MNPD "determined that [the video] warranted more additional investigation[,]" and the detectives "decided to identify the people that were in that surveillance video and interview them." Sergeant Shreeve explained that the VPD identified E.L. as the unconscious female in the video, and the detectives interviewed E.L. on the evening of June 26. He also stated that he did not have probable cause to arrest Defendant based on the information available to the MNPD on the morning of June 27.

On cross-examination, Sergeant Shreeve testified that, while he was in the VPD headquarters with Detective Mayo and Defendant, there were only two or three uniformed VPD officers in the building. Sergeant Shreeve also testified that the VPD officers did not threaten Defendant verbally or through mannerisms or body language. He stated that, during the interview, he sat to Defendant's left and Detective Mayo sat on Defendant's right. He explained that he and Detective Mayo did not sit between Defendant and the door of the interview room because the officers sat in front of Defendant and to the side. Sergeant Shreeve and Detective Mayo were not in uniform, but they were armed. Sergeant Shreeve explained that, per MNPD policy, he and Detective Mayo kept their weapons covered during the interview because it was a public setting. He denied that he or Detective Mayo made any threatening gestures towards Defendant during the interview. Defendant never asked Sergeant Shreeve or Detective Mayo why VPD officers told him he had to give a statement and answer questions, but Detective Mayo stated that he could decline to answer questions and leave.

Detective Mayo testified that he worked in the sex crimes unit of the MNPD. He explained that the interview with Defendant occurred in Captain Harville's office at the VPD headquarters. He noted that the door was not locked because Sergeant Shreeve had exited and reentered the room during the interview. During the interview, Detective Mayo sat behind the desk in Captain Harville's office, Sergeant Shreeve sat "in the front corner of the room[,]" and Defendant sat "where the door was located." Both Detective Mayo and Sergeant Shreeve identified themselves to Defendant as officers of the MNPD.

On cross-examination, Detective Mayo testified that he was not in uniform during the interview with Defendant. He did not recall seeing any uniformed VPD officers when he arrived at the VPD headquarters. During the interview, Defendant was not physically restrained with handcuffs and "[a]ppeared fine, maybe a little nervous." Defendant did not appear to be under the influence of any drug or intoxicating substance. Detective Mayo did not instruct any VPD officers to threaten or coerce Defendant into answering questions. Additionally, Detective Mayo did not observe that any VPD officers threatened or coerced Defendant, and Defendant did not inform Detective Mayo that he had been threatened or coerced. Detective Mayo began the interview with the following statements:

... [Defendant], I am Detective Jason Mayo. I work for the Metro Nashville Police Department. Okay? This is my sergeant, Mike Shreeve. Obviously we're here to talk to you. Okay? You need to understand a couple of things before we talk. Okay? Number one, you are not under arrest. Okay? I want to make that perfectly clear. Okay? You are not under arrest and you do not have to speak to me. It is well within your right to tell me I don't want to talk to you, okay, and you'll get up and you'll leave. Okay? You're not being -- you know, the door's closed for privacy only. It's not locked. Okay? Matter of fact, if you want, you can reach over and check it. You don't have to sit here and talk to us. But obviously, we're here to get your side of a situation. And obviously you understand what situation we're talking about. Okay?

And I've kind of -- I've got some opinions on some things. Okay? And this could or could not be a way to help yourself. Okay? And if you want to cooperate and, you know, talk to us, great. We'll sit here. We'll talk to you all day long if we need to. Okay? I'm in no hurry. He's in no hurry. I'm getting paid. Okay. So, but, obviously there's -- there's two sides to every story. Right? Right now I've got part of one, but I need to fill in a lot of blanks. Make sense? Okay.

[Defendant], you understand everything I just said, right, that you don't have to sit in here, right? You don't have to talk to me. All right. With all that in mind, you're willing to sit here and kind of talk to us for a little bit?

Defendant agreed to speak with Detective Mayo and Sergeant Shreeve as long as he felt comfortable. Later during the interview, Detective Mayo asked Defendant if he consumed alcohol while at Tin Roof. Defendant stated that he did not "feel comfortable answering that question." Detective Mayo reminded Defendant that he was an MNPD officer and did not work for Vanderbilt. Defendant responded that he did not believe that the question was relevant. Detective Mayo stated that the question could be relevant but that he was "not going to pressure [Defendant] to answer it." Detective Mayo and Sergeant Shreeve spoke in normal tones during the interview with Defendant. Additionally, neither officer displayed their weapon during the interview. Detective Mayo agreed that Defendant never asked to leave the interview.

Detective Mayo testified that, during the interview, he asked Defendant if he could inspect Defendant's cell phone. Defendant agreed to allow Detective Mayo to access the contents of the phone. Detective Mayo asserted that he did not access the contents of the cell phone before Defendant signed a consent form. He explained that he stayed at the VPD headquarters while Defendant retrieved the phone. On redirect examination, Detective Mayo stated that Defendant never asked for the advice of counsel during the interview. Defendant asked to know if he needed to get a lawyer, and Detective Mayo stated that he would give Defendant a "head's up."

Kevin Colon testified that he worked as the Associate Athletic Director for Vanderbilt University. He stated that on June 25, 2013, he took Defendant and other student athletes to Mr. Black's office. Mr. Colon stated that he made general conversation with the group of students but did not speak individually with Defendant. On June 27, Mr. Colon escorted Defendant to the VPD headquarters at Captain Harville's request. During the trip, Defendant asked Mr. Colon why he needed to go to the VPD headquarters. Mr. Colon stated that he was unsure, but he assumed it was related to "the previous weekend activities." Mr. Colon testified that he did not threaten Defendant with the potential of losing his scholarship, and he did not overhear anyone else threaten Defendant with the loss of his scholarship.

During cross-examination, Mr. Colon testified that he did not have any decision-making authority over athletic scholarships. He explained that, when he asks students to accompany him to Mr. Black's office, students have the option to decline and have done so in the past. He was unaware of any ongoing criminal investigation when he asked Defendant to accompany him to the VPD headquarters, and he did not know that Defendant would be meeting with Detective Mayo and Sergeant Shreeve at the headquarters. He explained that he spoke with a member of the football staff about escorting students to meet with Mr. Black and that the member gathered the students. Mr. Colon waited with the remaining students while the students were interviewed one at a time. Mr. Colon stated that the students "were told to place their phones on top of the desk" in front of each student while they were waiting to be interviewed. Mr. Colon observed Defendant use his phone while waiting to be interviewed. Mr. Colon agreed that the students were told not to speak to one another while waiting to be interviewed.

Captain Harville testified that he worked in the Criminal Investigation Division of the VPD. He stated that he asked Mr. Colon to escort Defendant to the VPD headquarters. After Defendant arrived with Mr. Colon, Captain Harville brought Defendant into the headquarters and into his office to meet with Detective Mayo and Sergeant Shreeve. Captain Harville testified that there were no uniformed VPD officers that displayed threatening body language towards Defendant. He explained that only detectives and administrative staff work in the VPD headquarters, and he was dressed in street clothes. He additionally stated that, while he carried a weapon, the weapon was concealed under a vest. Captain Harville introduced himself to Defendant and informed Defendant that Detective Mayo and Sergeant Shreeve wanted to speak with Defendant. He did not threaten Defendant with any consequences if Defendant did not speak to Detective Mayo and Sergeant Shreeve. During cross-examination, Captain Harville agreed that there was an ongoing criminal investigation when he escorted Defendant to meet with Detective Mayo and Sergeant Shreeve. However, he stated that Defendant was not a target of the investigation at that point.

On October 20, 2014, the trial court entered an order that denied Defendant's motion to suppress. The trial court found that Defendant "was not in custody [or] under arrest and was not compelled to speak with the detective" when Sergeant

Shreeve and Detective Mayo interviewed Defendant at the VPD headquarters. The trial court concluded that Detective Mayo and Sergeant Shreeve were not required to inform Defendant of his *Miranda* rights. Additionally, the trial court found that "a valid search warrant was issued and executed" on Defendant.

The applicable standard of review for suppression issues is well-established. A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing and all reasonable and legitimate inferences that may be drawn therefrom. *Id*. The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. *Id*. (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005); *v. Walton*, 41 S.W.3d at 81; *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998).

Both the United States and Tennessee Constitutions protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Walton*, 41 S.W.3d at 82. As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444.

Our supreme court has stated that the test to determine whether a defendant was in custody is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). Our supreme court set out the following non-exclusive factors to assist in this determination:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of

restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id*. (internal citations omitted). The Supreme Court of the United States has recognized that "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

After reviewing the record on appeal, we conclude that the trial court properly denied Defendant's motion to suppress because a reasonable person would not have felt "deprived of freedom of movement to a degree associated with a formal arrest." *See Anderson*, 937 S.W.2d at 855. Here, Mr. Colon escorted Defendant to meet with Detective Mayo and Sergeant Shreeve on the Vanderbilt campus at the VPD headquarters, which housed non-uniformed detectives and administrative personnel. Mr. Colon did not threaten Defendant that he would lose his scholarship if he did not speak with Detective Mayo and Sergeant Shreeve. When Defendant arrived at the VPD headquarters, he met with Detective Mayo and Sergeant Shreeve in Captain Harville's unlocked office. Detective Mayo began the recorded interview by stating that Defendant could refuse to answer any questions and could leave at any time. The recording reflects that Detective Mayo and Sergeant Shreeve used a normal tone of voice when interviewing Defendant. Further, it is clear that Defendant understood that he could decline to answer questions because he refused to answer Detective Mayo's question about drinking at Tin Roof. During the interview, Detective Mayo asked for access to Defendant's cell phone, and Defendant agreed. Defendant also consented to give a DNA sample to the MNPD officers and to conduct a controlled phone call to Co-defendant Batey. Although the trial court did not make specific credibility findings in its order denying the motion to suppress, the trial court impliedly discredited Defendant's testimony and credited the testimony of Captain Harville, Detective Mayo, Mr. Colon, and Sergeant Shreeve. The evidence does not preponderate against the trial court's findings that Defendant "was not in custody [or] under arrest and was not compelled to speak" during his interview at the VPD headquarters.

When we consider the totality of the circumstances that surrounded Defendant's interview with Detective Mayo and Sergeant Shreeve, we conclude that Defendant was not in custody. *See State v. Eric Foster*, No. E2018-01205-CCA-R3-CD, 2019 WL 1546996, *13-14 (Tenn. Crim. App. Apr. 9, 2019) (concluding that an interview between the defendant and law enforcement were non-custodial when the detective's demeanor was "nonconfrontational[,]" the interviews occurred in locations convenient for the defendant, and the defendant was not restrained in any

70

way), no perm. app. filed. Thus, Detective Mayo and Sergeant Shreeve were not required to inform Defendant of his rights under *Miranda* prior to speaking with him. Defendant is not entitled to relief on this ground.

*Vandenburg*, 2019 WL 3720892, at \*37-43 (footnote omitted).

Before addressing the merits, the Court should consider dismissing the claim because Vandenburg again argues it in error-correction terms, not in AEDPA terms. Because habeas corpus is not a means for error correction, *Hale*, 122 F.4th at 645, the Court may summarily dismiss this argument lacking AEDPA analysis. *Hank*, 2014 WL 4626456, at \*3.

But even if Vandenburg properly argued the claim, he is still unentitled to relief. As he correctly observes, the underlying facts inform the legal conclusions, so their reasonableness will be addressed first. (*See* ECF 1-1, Page ID# 29.) And Vandenburg is entitled to no relief under § 2254(d)(2) because he incorrectly observes and uses his own, unaccredited version of the facts to support his relief arguments.

A state-court factual determination "is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 571 U.S. at 18 (cleaned up). But that is what Vandenburg effectively requests by reiterating his version of the facts underlying the suppression issue. Indeed, he has not shown that the record "compel[s] the conclusion that the [TCCA] had no permissible alternative but to arrive at the contrary conclusion." *Carter*, 900 F.3d at 768 (internal quotation marks omitted) (quoting *Rice*, 546 U.S. at 342-42).

Although he has not tried to satisfy this showing, the record prevents Vandenburg from doing so. Indeed, the transcripts of the suppression hearing show that the accredited facts were supported by the various witnesses' testimonies. Importantly, the crux of Vandenburg's argument, that he felt compelled to provide a statement and to allow the detectives to access his cell phone under threat of losing his scholarship, went unaccredited. (ECF 1-1, Page ID# 26-32.) He claimed

71

Mr. Colon told him that he could "return to the football team if he answered all of the VPD's questions." *Vandenburg*, 2019 WL 3720892, at *38. Yet, Mr. Colon testified that "he did not threaten [Vandenburg] with the potential of losing his scholarship, and he did not overhear anyone else threaten [Vandenburg] with the loss of his scholarship." *Id*. at *41. And the transcript reflects this fact that the trial court accredited. *Id*. at *42; (ECF 19-1, p. 185).

Considering the record supports this key fact, Vandenburg cannot show the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). And his contradictory assertions that he continues to make are unfounded and certainly do not rebut the presumption of correctness afforded the state court's factual determination. § 2254(e)(1). He is not entitled to relief based upon the factual reasonableness of the TCCA's adjudication.

The same is true of the TCCA's adjudication of the Fifth Amendment question. § 2254(d)(1). Liberally construing Vandenburg's error-correction argument, he has not shown how the TCCA's adjudication contradicted the governing clearly established federal law, *Miranda v. Arizona*, 384 U.S. 436 (1966). Nevertheless, he would not succeed in this showing because the TCCA quoted and cited *Miranda* in support of its holding that Vandenburg was not in custody, and "[t]hus, Detective Mayo and Sergeant Shreeve were not required to inform Defendant of his rights under *Miranda* prior to speaking with him." *Id*. at *42-43. Since the TCCA correctly cited and applied *Miranda*, the adjudication is not contrary to it. *Williams*, 529 U.S. at 406.

Finally, the adjudication does not involve an unreasonable application of clearly established federal law. When deciding the claim, the TCCA quoted *Miranda*'s holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of the procedural safeguards effective

to secure the privilege against self-incrimination." *Vandenburg*, 2019 WL 3720892, at *42 (quoting *Miranda*, 384 U.S. at 444). The TCCA then correctly noted the required warnings of which police must "inform persons who are subjected to custodial interrogation[.]" *Id.* (quoting *Miranda*, 384 U.S. at 444).

The TCCA proceeded to reasonably apply *Miranda* using the accredited facts to decide that Vandenburg was not in custody when he provided his police statement, meaning the detectives did not need to provide the warnings. *Id.* at *43. The accredited facts reflected that Vandenburg was not threatened by scholarship loss if he did not cooperate; that the interview occurred in an unlocked office; that the detectives told Vandenburg that he could refuse questioning and leave if he wanted; that the detectives maintained a "normal tone of voice" when interviewing Vandenburg; and that Vandenburg understood he could decide against answering questions since he "refused to answer Detective Mayo's question about drinking at Tin Roof." *Id.* Based on these accredited facts, the trial court implicitly "discredited" Vandenburg's testimony and decided that he was not in custody, thus not triggering *Miranda*. *Id.*

Vandenburg also contends that the detectives accessing his cell phone constituted fruit of the poisonous tree because it derived from his unconstitutionally provided statement. (ECF 1-1, Page ID# 27-28, 30.) But this argument is wrong legally. "The 'fruit of the poisonous tree' doctrine has not been applied as a remedy for *Miranda* violations[,]" which did not occur here anyways. *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *United States v. Patane*, 542 U.S. 630, 642-43 (2004) (plurality)). That is because a *Miranda* violation "does not require suppression of the [nontestimonial] physical fruits of a suspect's otherwise voluntary statements." *Id.* (quoting *Patane*, 542 U.S. at 634). So, although this fruit-of-the-poisonous-tree argument has no applicability here, if it did, the tree—Vandenburg's statement—was not poisonous at all.

73

Moreover, Vandenburg consented to Detective Mayo's request for access to his cell phone while providing his constitutionally-sound statement. *Vandenburg*, 2019 WL 3720892, at *43. "The Fourth Amendment proscribes unreasonable searches and seizures, [but] it does not proscribe voluntary cooperation." *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005) (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). "[T]he question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality of the circumstances." *Id*. (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Here, the trial court found, and the TCCA agreed, that Vandenburg consented to the detectives accessing his cell phone during his non-custodial interview, meaning his consent was not "the product of duress or coercion." *Vandenburg*, 2019 WL 3720892, at *43. The cell phone access, therefore, was constitutionally sound too.

On habeas review, § 2254(d)(1)'s unreasonable-application clause tasks Vandenburg with showing how the state-court adjudication was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Donald*, 575 U.S. at 316. Given Vandenburg's self-serving reiteration of these events, he certainly has not pointed out how the TCCA unreasonably applied federal law. He therefore is entitled to no relief under § 2254(d)(1).

Vandenburg is not entitled to relief based upon his Fifth Amendment claim, and the Court should dismiss Ground Three with prejudice.

## V.     Vandenburg Procedurally Defaulted the Jury-Instruction Claim Alleged in Ground Five, and He Cannot Excuse the Default Even if He Tried.

Vandenburg challenges the TCCA's decision, conducted under plain-error review, that the trial court did not violate his constitutional right to a correct jury instruction about the "required culpable mental state for criminal responsibility for the conduct of another" being "knowingly."

74

(ECF 1-1, Page ID# 35-40.) Vandenburg complains that the trial court incorrectly instructed the jury by not stating that it must find Vandenburg "aid[ed] and abett[ed]" his co-defendants "intentionally." (ECF 1-1, Page ID# 35.) But the Court need not examine this claim because it is procedurally defaulted through the invocation of an adequate and independent state procedural rule.

This Court cannot examine a federal question "decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729. The adequate and independent doctrine applies to habeas petitions "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id*. at 729-30. Thus, the state judgment itself rests on "independent and adequate state procedural grounds." *Id*. at 730. Federal courts must honor this doctrine in habeas cases because, if not, "habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of [federal] jurisdiction and a means to undermine the State's interest in enforcing its laws." *Id*. at 730-31. When determining whether a claim has been procedurally defaulted based on an adequate and independent state procedural rule, the court applies the following test:

> (1) the court must determine that there is a state procedural rule with which the petitioner failed to comply; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) the state procedural rule must have been an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error.

*Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

75

These four factors are satisfied here. Vandenburg conceded on direct appeal that he did not comply with a state procedural rule by "not includ[ing] the issue in his motion for new trial[.]" *Vandenburg*, 2019 WL 3720892, at *48. Tennessee Rule of Appellate Procedure 3 treats jury-instruction issues as "waived" on appeal "unless the same was specifically stated in a motion for a new trial[.]" Tenn. R. App. P. 3(e); *State v. Hugueley*, 185 S.W.3d 356, 377 (Tenn. 2006). Thus, the first *Monzo* factor is satisfied, as is the second since the TCCA "actually enforced the state procedural sanction." *Monzo*, 281 F.3d at 576. This is shown by the TCCA limiting its review of the claim to whether plain error occurred rather than engaging in plenary review.[8] *Vandenburg*, 2019 WL 3720892, at *48-49.

And the third *Monzo* factor is satisfied too. "To be adequate, a state procedural rule must be firmly established and regularly followed." *Fautenberry v. Mitchell*, 515 F.3d 614, 640 (6th Cir. 2008). "A state ground of decision is independent only when it does not depend on a federal holding, . . . , and also is not intertwined with questions of federal law[.]" *Glossip v. Oklahoma*, 145 S. Ct. 612, 624 (2025) (citations omitted). The independent analysis is simple. After all, the rule requiring appellants to preserve their perceived errors in a motion for a new trial is codified in Tennessee Appellate Rule 3(e) and certainly depends on no "federal constitutional ruling." *See id*.

The rule is also "adequate" because it is "firmly established and regularly followed" as shown by the following non-exhaustive list of cases that were decided before Vandenburg's 2016 jury trial and direct appeal. *Hugueley*, 185 S.W.3d at 377 (waived issue under Rule 3(e) by not

---

[8] The fact that the TCCA conducted a plain-error analysis "does not save a petitioner from procedural default" but rather constitutes "a court's right to overlook procedural defects to prevent manifest injustice[.]" *Lundgren*, 440 F.3d at 765. "[B]ut [it] is not equivalent to a review of the merits." *Id*.

raising it in new-trial motion); *State v. Walker*, 910 S.W.2d 381, 386 (Tenn. 1995) (issue waived by failure to include it in new-trial motion and citing Rule 3(e)); *State v. Jones*, No. M2004-00077-CCA-R3-CD, 2012 WL 4392643, at \*11 (Tenn. Crim. App. Sept. 26, 2012) (citing Rule 3(e), waiver "where a party fails to include an issue in its motion for new trial) (no perm. app. filed); *State v. Hayes*, No. M2008-02689-CCA-R3-CD, 2010 WL 5344882, at \*10 (Tenn. Crim. App. Dec. 23, 2010) (waived issue under Rule 3(e) by not including issue in new-trial motions), *perm. app. denied* (Tenn. May 25, 2011); *State v. Sherron*, No. W2003-01222-CCA-R3-CD, 2004 WL 541164, at \*6 (Tenn. Crim. App. Mar. 15, 2004) (same), *perm. app. denied* (Tenn. Oct. 4, 2004). Put simply, the third *Monzo* factor is satisfied, meaning Vandenburg "must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error." 281 F.3d at 576.

And he has not done that since he neither acknowledges nor appreciates that the claim is procedurally defaulted through this adequate-independent state rule. (ECF 1-1, Page ID# 35-40.) But regardless of Vandenburg's failure to plead, he could not show "actual prejudice" to excuse this default. After all, the "overwhelming" evidence of his guilt certainly prevents a prejudice showing. *Vandenburg*, 2019 WL 3720892, at \*48; *Wright v. Lazaroff*, 643 F. Supp. 2d 971, 988-89 (S.D. Ohio 2009) ("overwhelming evidence" of guilt prevented prejudice showing). Moreover, the TCCA's plain-error analysis, where it observed that the trial court breached no clear and unequivocal rule of law and that it instructed the jury on the "definition of 'intentionally'" earlier in the jury charge, militates against a prejudice showing. *Rust*, 17 F.3d at 162. The record supports this decision. (ECF 16-11, Page ID# 1268; ECF 16-50, Page ID# 6347.) Simply said, there is no manifest injustice warranting the Court to excuse the procedural default.

The Court should dismiss this procedurally defaulted claim with prejudice.

**VI. Although Vandenburg Procedurally Defaulted Ground Six by Not Raising it in his New-Trial Motion, the Claim Provides No Relief Regardless of the Review Standard Because the Unlawful-Photography Statute is Not Void for Vagueness.**

Vandenburg claims that the unlawful photography statute, Tenn. Code Ann. § 39-13-605, is unconstitutionally void for vagueness because subsection (a) "does not define the standard for when an 'individual has a reasonable expectation of privacy.'" (ECF 1-1, Page ID# 40-41.) However, he does not acknowledge that this claim is procedurally defaulted.

While Vandenburg argued this claim on direct appeal, the State observed, and the Court agreed, that he "waived plenary consideration of this issue by failing to 'challenge the statute in the trial court, either during trial or in his motion for a new trial.'" *Vandenburg*, 2019 WL 3720892, at *64. The fact that Vandenburg did not properly raise the claim in his motion for a new trial is an adequate and independent state procedural ground upon which this Court may deny habeas corpus review.

Again, petitioners waive "issues raised in the Tennessee Court of Criminal Appeals that were not included in the [] motion for new trial." *Keller v. Genovese*, 65 F.4th 785, 789 (6th Cir. 2023) (citing *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010)); *see* Tenn. R. App. P. 3(e). Thus, this "is a state procedural rule" of which Vandenburg had to comply but did not, which the TCCA acknowledged. *Vandenburg*, 2019 WL 3720892, at *64.

Habeas review is precluded by procedural default where the state court "clearly and expressly relied on waiver as a ground for rejecting" the claims. *Smith v. Cook*, 956 F.3d 377, 385 (6th Cir. 2020) (cleaned up). So long as the TCCA "made a clear and express statement," like it did here by agreeing with the State that Vandenburg failed to include the issue in his new-trial motion, "procedural default would still apply even if the state court also addressed the claim's merits[.]" *Id.* (internal quotation marks omitted); *see also e.g.*, *Simpson v. Jones*, 238 F.3d 399, 408-09 (6th Cir. 2000) (state court "noted that Simpson did not object to the prosecutor's comments

78

at trial," leading to default although the court addressed "the merits of Simpson's argument"). While the TCCA could have more forcefully invoked "the punchline," it certainly did not "omit[]" it. *Smith*, 956 F.3d at 385. Thus, the first two *Monzo* factors are satisfied.

And the third factor is certainly satisfied too. "To be adequate, a state procedural rule must be firmly established and regularly followed." *Fautenberry*, 515 F.3d at 640. To be "independent," the "state-law prong of the court's holding" must not "depend on a federal constitutional ruling[.]" *Zagorski v. Mays*, No. 3:99-cv-1193, 2006 WL 8455679, at \*12 (M.D. Tenn. Mar. 31, 2006) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)). Here, the *Keller* panel answered both questions. Like *Keller*, the TCCA agreed that Vandenburg waived review of the federal issue by failing to raise the claim in his motion for a new trial; thus, the "state-law prong" did not depend on a federal constitutional analysis. *Vandenburg*, 2019 WL 3720892, at \*64. And this state procedural rule has been found "adequate" already too. *Keller*, 65 F.4th at 791; *Avilez-Caneles v. Clendenion*, No. 3:22-cv-8, 2022 WL 3971037, at \*9 (E.D. Tenn. Aug. 30, 2022) (Rule 3(e) "is an adequate and independent state law ground for denying review"). As shown, the claim is subject to dismissal unless Vandenburg can "demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error." *Monzo*, 281 F.3d at 576.

Vandenburg has done neither. He does not acknowledge his failure to comply with the state procedural rule or the TCCA's agreement with the State on direct appeal about his failure. (ECF 1-1, Page ID# 40-41.) He therefore alleges no cause or prejudice to excuse the default.

Regardless of his lack of compliance with state law, Vandenburg still received review of the claim "because of the gravity of constitutional issues." *Vandenburg*, 2019 WL 3720892, at \*64. The TCCA addressed the claim, although it could have so declined, as follows:

79

"When reviewing the constitutionality of a statute, we begin "with the presumption that an act of the General Assembly is constitutional" and "must indulge every presumption and resolve every doubt in favor of constitutionality." *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997).

## (A) Unconstitutionally vague

"The primary purpose of the vagueness doctrine is to ensure that our statutes provide fair warning as to the nature of forbidden conduct so that individuals are not 'held criminally responsible for conduct which [they] could not reasonably understand to be proscribed.'" *State v. Crank*, 468 S.W.3d 15, 22-23 (Tenn. 2015) (alteration in original) (quoting *United States v. Hariss*, 347 U.S. 612, 617 (1954)). Where there is ambiguity in a statute, the rule of lenity requires the ambiguity to be resolved in favor of a defendant. *State v. Smith*, 436 S.W.3d 751, 768 (Tenn. 2014). The rule of lenity is "rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his or her conduct is prohibited." *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010) (internal quotation marks omitted) (quoting *Dunn v. United States*, 442 U.S. 100, 112 (1979)). A statute is ambiguous if the language "is susceptible [to] more than one reasonable interpretation[.]" *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001). Nonetheless, a vague or ambiguous statute may still provide fair warning of the prohibited conduct and not render the statute unconstitutionally vague. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010). "The vagueness doctrine does not invalidate every statute which a reviewing court believes could have been drafted with greater precision, especially in light of the inherent vagueness of many English words." *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990). "It is only when the wording of a statute is 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,' that the statute is unconstitutional." *Estrin v. Moss*, 430 S.W.2d 345, 351-52 (Tenn. 1968) (quoting *Connally v. General Construction Co.*, 269 U.S. 385 (1925)).

The United States Supreme Court has established a two-part test for vagueness challenges. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). The court must first determine whether the statute in question implicates constitutionally protected conduct. *Id*. If it does not, the court "should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Id*. at 494-95. "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). Stricter standards of permissible statutory vagueness may be applied to a statute if it has the potential to inhibit an individual's First Amendment rights. *Village of Hoffman Estates*, 455 U.S. at 499; *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 287 (1961); *Smith v. California*, 361 U.S. 147, 151 (1959). Moreover, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot

complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates*, 455 U.S. at 495.

### (B) Fair Warning

The principles of vagueness and fair warning are interrelated. A "vague statute is vulnerable to a constitutional challenge because it (1) fails to provide fair notice that certain activities are unlawful; and (2) fails to establish reasonably clear guidelines for law enforcement officials and courts, which, in turn, invites arbitrary and discriminatory enforcement." *State v. Pickett*, 211 S.W.3d 696, 702 (Tenn. 2007). In regards to the former, "[d]ue process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have understood to be proscribed." *State v. Burkhart*, 58 S.W.3d 694, 697 (Tenn. 2001) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). To avoid constitutional infirmity, a criminal statute must be "sufficiently precise to put an individual on notice of prohibited activities." *Id.* (quoting *State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn. 1983)).

The United States Supreme Court characterized the fair warning principle as follows:

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

*Harriss*, 347 U.S. at 617.

### (C) Plain language of section 39-13-605

At the time of Defendant's offense in 2013, "reasonable expectation of privacy" was not defined in the unlawful photography statute or anywhere in Title 39 of the Tennessee Code Annotated. Prior to Defendant's offense, section 39-13-605 prohibited photography of an individual "when the individual is in a place where there is a reasonable expectation of privacy, without the prior effective consent of the individual." Tenn. Code Ann. § 39-13-605 (2010) (emphasis added). Tennessee courts concluded that the statute's meaning was clear: whether an individual has an expectation of privacy depends on his or her location at the time of the photography, and an expectation of privacy is not typically reasonable in public places. *See, e.g.*, *State v. Jesse B. Gilliland*, No. M2008-02767-CCA-R3-CD, 2010 WL 2432014, at *4 (Tenn. Crim. App. June 17, 2010) (finding that although the defendant photographed underneath a woman's skirt without her consent, the victim did not have a reasonable expectation of privacy because she was in a public shopping mall), no perm. app. filed; *State v. Richard Alexander Herrera*, No. W2010-00937-CCA-R3-CD, 2011 WL 4432895, at *3 (Tenn. Crim. App. Sept. 23, 2011) (finding

81

that a woman did not have a reasonable expectation of privacy in a shopping aisle at Walmart), no perm. app. filed. In 2010, the statute was amended to eliminate the reference to location. It prohibited photography of an individual without their consent "when the individual has a reasonable expectation of privacy." Tenn. Code Ann. § 39-13-605 (2013). This language applied when Defendant committed the offenses in the current case.

The first part of the vagueness test requires this court to determine whether the statute implicates constitutionally protected conduct. In *Village of Hoffman Estates*, the Village enacted an ordinance which required a business to obtain a license if it sold any items that are "designed or marketed for use with illegal cannabis or drugs." *Village of Hoffman Estates*, 455 U.S. at 491 (quoting *Village of Hoffman Estates Ordinance* No. 969-1978). A local store, The Flipside, Hoffman Estates, Inc. (Flipside), which sold a variety of merchandise including smoking accessories, challenged the ordinance in the district court as being unconstitutionally vague and overbroad. *Id*. On review, the Supreme Court first examined whether the ordinance infringed upon Flipside's First Amendment Rights. *Id*. at 496. The Court decided that it did not, because the ordinance simply regulated business behavior. *Id*.

Here, the statute in question prohibits the photography of un-consenting subjects when they have a reasonable expectation of privacy and for the purpose of sexual gratification of the defendant. Tenn. Code Ann. § 39-13-605 (2013). Although Defendant did not argue this on appeal, photographs are generally protected as artistic expression under the First Amendment. As the Supreme Court has repeatedly noted, however, there are certain classes of expression which may be controlled by statute without offending the values of the First Amendment. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942).

> These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Id*. at 572. The Tennessee Court of Appeals held in *Purifoy v. Mafa* that repeated videos and social media postings of the defendant's therapist were "clearly meant to harass, degrade, intimidate, threaten, and humiliate" the subject of the photographs and were therefore not protected speech. 556 S.W.3d 170, 192 (Tenn. Ct. App. 2017). Similarly, here, Defendant took photos and videos of the victim while she was unconscious, in a state of undress, and being raped and sexually battered. These photos and videos are analogous to the postings in *Purifoy* and the language in *Chaplinsky* in that they degraded, harassed, threatened, and humiliated the victim, and any benefit that Defendant may have derived from them is clearly outweighed by the "social interest in order and morality." *Chaplinsky*, 315 U.S. 568 at 571. Defendant's photographs and videos of the victim are therefore not constitutionally protected by the First Amendment.

82

"A law that does not reach constitutionally protected conduct ... may nevertheless be challenged on its face as unduly vague, in violation of due process." *Village of Hoffman Estates*, 455 U.S. at 497. To succeed with this claim, Defendant must demonstrate that the law is impermissibly vague in all of its applications. *Id*.; *Burkhart*, 58 S.W.3d at 699. Further, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates*, 455 U.S. at 495; *Burkhart*, 58 S.W.3d at 699. This court must therefore examine Defendant's conduct before analyzing hypothetical applications of the law. *Burkhart*, 58 S.W.3d at 699.

In *Burkhart*, the defendant was charged with possession of a gambling device in violation of Tennessee Code Annotated section 39-17-505 (1989). *Id*. at 696. She moved to dismiss the charges on the grounds that "gambling devices" as used in the statute was unconstitutionally vague. *Id*. The Tennessee Supreme Court held that the statute was not unconstitutionally vague as applied to Ms. Burkhart because she had engaged in conduct that is clearly proscribed by the statute. *Id*. at 698. The Tennessee Supreme Court explained that a slot machine, which Burkhart was charged with possessing, is designed for use in gambling and normally intended for use in gambling. *Id*. The Tennessee Supreme Court followed *Boyce Motor Lines v. United States* in concluding that "it is not 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *Burkhart*, 58 S.W.3d at 698 (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952)).

Here, Defendant's conduct in violation of Tennessee Code Annotated section 39-13-605 includes the photography of an unconscious victim in a state of undress while being raped and sexually battered. As the State correctly notes, "[t]here can be no doubt that the defendant should have been aware that taking videos [and photos] of the victim while undressed, passed out, and being sexually assaulted was prohibited by law. In other words, a person of common intelligence would have reasonably understood that such conduct was proscribed."

Like Ms. Burkhart, Defendant perilously approached the line of proscribed conduct and eventually crossed it. *See id*. Regardless of whether "reasonable expectation of privacy" is defined in the Tennessee Code, a person of "common intelligence" would understand that a person who is unconscious, undressed, and being sexually assaulted has a reasonable expectation of privacy not to be photographed during the assault and rape. *See Estrin*, 430 S.W.2d at 351-52. Defendant's photography of the victim, therefore, was "clearly proscribed" by section 39-13-605 (2013). *See Village of Hoffman Estates*, 455 U.S. at 495. Because the statute is not vague as applied to Defendant, he cannot successfully challenge the statute as facially vague. *See Burkhart*, 58 S.W.3d at 699.

Further, this court can look to other sources that define "reasonable expectation of privacy," namely, the Fourth Amendment of the United States Constitution and case law interpreting it. "The touchstone of unreasonable search and seizure analysis is

83

whether a person has a constitutionally protected reasonable expectation of privacy." *State v. Bowling*, 867 S.W.2d 338, 341 (Tenn. Crim. App. 1993) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)) (internal quotation marks omitted). The United States Supreme Court in *United States v. Katz* developed a two-prong test for determining whether an individual has a reasonable expectation of privacy, *see* 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Courts must first analyze whether the victim had "exhibited an actual (subjective) expectation of privacy," and second, "whether that expectation be one that society is prepared to recognize as 'reasonable.'" *Id*. The United States Supreme Court and Tennessee courts have applied these two questions repeatedly to Fourth Amendment issues. *See Ciraolo*, 476 U.S. at 211; *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Bowling*, 867 S.W.2d at 341; *State v. Roode*, 643 S.W.2d 651, 652-53 (Tenn. 1982). Tennessee later applied this approach while accounting for the totality of the circumstances. *See State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010) (deciding that the defendant did not have a reasonable expectation of privacy from searches and seizures in a common hallway of his condominium complex because "each of the residents ... had the right to permit entry without restrictions. Neither the [d]efendant nor any other residents could unilaterally exclude others rightfully within the hallway.").

The Sixth Circuit has since applied the totality of the circumstances test from *Talley* to privacy questions dealing with Tennessee's unlawful photography statute. See *Savoy v. United States*, 604 F.3d 929, 935 (6th Cir. 2010) (explaining that whether an individual had a reasonable expectation of privacy is a fact-intensive, totality-of-the-circumstances inquiry). In *Savoy*, the defendant appealed the denial of his motion to retrieve videotapes seized by police officers. *Id*. at 932. His motion was denied in part because the videos were deemed unlawful. *Id*. Defendant argued that they were not unlawful because the subjects of the videos (patrons at his bar engaging in sexual acts) did not have a reasonable expectation of privacy in his bar. *Id*. The Sixth Circuit remanded the issue, instructing the lower court to examine the totality of the circumstances surrounding the videos to determine if the subjects of the videos had a reasonable expectation of privacy. *Id*. at 937. They elaborated that the relevant factors to consider are (1) whether the premises were open to the public for business purposes at the time of the photography; (2) whether the specific locations were hidden from public view; (3) and whether any steps were taken in an attempt to maintain the privacy of the activities that occurred in each video. *Id*. at 937-38.

We conclude that section 39-13-605 is not unconstitutionally vague because the statute is not vague as applied to Defendant and because the phrase "reasonable expectation of privacy" has been defined in other areas of criminal case law. Defendant is not entitled to relief on this ground.

*Vandenburg*, 2019 WL 3720892, at *64-68.

Vandenburg's argument fails for many reasons. He assumes proper exhaustion of the claim and argues, like his other claims, his entitlement to relief without any AEDPA analysis. (ECF 1-1, Page ID# 40-41.) He is simply wrong regarding proper exhaustion, but even if he is correct on that point, the Court may dismiss the claim summarily because of his failure to properly argue claim in AEDPA terms. *Hank*, 2014 WL 4626456, at *4.

Moreover, he curiously asserts that, although the TCCA wrote a four-page constitutional analysis with citation to federal law, the state court did not "actually determine whether 'reasonable expectation of privacy' is defined at any point in the" Tennessee Code. (ECF 1-1, Page ID# 41.) He believes the TCCA shirked the question by "point[ing] to case law that is not under scrutiny." (ECF 1-1, Page ID# 41.)

But that case law included the relevant clearly established federal law governing vagueness challenges including the case establishing the "two-part test." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). *Vandenburg*, 2019 WL 3720892, at *65. The TCCA examined whether the statute prohibited constitutionally protected conduct—the first part of the vagueness test—and decided that, although "photographs are generally protected as artistic expression under the First Amendment[,]" some expression "may be controlled by statute without offending the values of the First Amendment." *Id*. at *66 (internal quotation marks omitted). The TCCA then explored the photography here, where Vandenburg photographed and videoed the unconscious, semi-nude victim as she was being sexually assaulted, and decided this situation was not "constitutionally protected" because it "degraded, harassed, threatened, and humiliated the victim[.]" *Id*. Thus, societal "interest in order and morality" outweighed "any benefit" to Vandenburg. *Id*. (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942)).

85

The TCCA then addressed whether the photography statute was facially vague as a due process matter, which required Vandenburg to prove the law "is impermissibly vague in all of its applications." *Id*. (quoting *Village of Hoffman Estates*, 455 U.S. at 497). The TCCA agreed with the State that "[t]here can be no doubt that the defendant should have been aware that taking videos" of the victim being sexually assaulted "was prohibited by law." *Id*. at *67. Thus, the TCCA held that, "[r]egardless of whether 'reasonable expectation of privacy' is defined in the Tennessee Code," one exercising "common intelligence would understand that a person who is unconscious, undressed, and being sexually assaulted has a reasonable expectation of privacy not to be photographed during the assault and rape." *Id*. (internal quotation marks omitted). Accordingly, the photography statute was not facially vague either. *Id*. at *67.

Because the TCCA cited and applied the correct clearly established federal law on vagueness challenges, Vandenburg cannot show that the state court issued a decision contradicting federal law. *Williams*, 529 U.S. at 405-06. Moreover, this claim concerns no challenge to the facts because it is a pure legal challenge. So, Vandenburg is entitled to no relief under § 2254(d)(2). But if the Court decides that his argument that the TCCA did not "properly review" the vagueness claim raised a factual challenge, that argument easily fails given the extensive analysis the TCCA undertook under governing law.

Finally, Vandenburg has not shown that the TCCA's extensive opinion on this issue involved an unreasonable application of federal law. As shown above, the TCCA carefully considered two different vagueness challenges, facial and as-applied, to the statute and reasonably applied the governing law when deciding that the statute was not void for vagueness. Given this, the state-court decision was certainly not "so lacking in justification" to warrant relief under § 2254(d)(1).

86

The Court should dismiss Ground Six with prejudice.

## CONCLUSION

The Court should deny a writ of habeas corpus and dismiss the petition with prejudice.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Nicholas S. Bolduc*
NICHOLAS S. BOLDUC
Senior Assistant Attorney General
Federal Habeas Corpus Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 507-6802
Email: Nicholas.bolduc@ag.tn.gov
T.B.P.R. No. 35050
COUNSEL FOR RESPONDENT

## CERTIFICATE OF SERVICE

I certify that this document was filed electronically on June 9, 2025. A copy of this document was sent via Fed-Ex to:

Mr. Brandon R. Vandenburg, #547159
Morgan County Correctional Complex
541 Wayne Cotton Morgan Drive
Wartburg, Tennessee 37887
*PRO SE* Petitioner

/s/ *Nicholas S. Bolduc*
NICHOLAS S. BOLDUC
Senior Assistant Attorney General